# NATIONAL BROILER MARKETING ASSN. *v.*
# UNITED STATES

No. 77–117.   Argued February 21, 1978—Decided June 12, 1978

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 829. WHITE, J., filed a dissenting opinion, in which STEWART, J., joined, *post*, p. 840.

*Richard A. Posner* argued the cause for petitioner. With him on the briefs were *Michael A. Doyle* and *Frederick H. Von Unwerth.*

*Assistant Attorney General Shenefield* argued the cause for the United States. With on the brief were *Solicitor General McCree, Frank H. Easterbrook, John J. Powers III,* and *Bruce E. Fein.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Once again,[1] this time in an antitrust context, the Court is confronted with an issue concerning integrated poultry operations. Petitioner phrases the issue substantially as follows:

Is a producer of broiler chickens precluded from quali-
fying as a "farmer," within the meaning of the Capper-

---

*A brief of *amici curiae* urging affirmance was filed for their respective States by *William J. Baxley,* Attorney General of Alabama; *Carl R. Ajello,* Attorney General of Connecticut; *John D. MacFarlane,* Attorney General of Colorado; *Robert L. Shevin,* Attorney General of Florida; *William J. Scott,* Attorney General of Illinois; *Robert F. Stephens,* Attorney General of Kentucky; *Francis X. Bellotti,* Attorney General of Massachusetts; *Frank J. Kelley,* Attorney General of Michigan; *William F. Hyland,* Attorney General of New Jersey; *William J. Brown,* Attorney General of Ohio; *Robert P. Kane,* Attorney General of Pennsylvania; *Richard C. Turner,* Attorney General of Iowa; *William J. Guste, Jr.,* Attorney General of Louisiana; *John D. Ashcroft,* Attorney General of Missouri; *Louis J. Lefkowitz,* Attorney General of New York; *Larry Derryberry,* Attorney General of Oklahoma; *James A. Redden,* Attorney General of Oregon; *Julius C. Michaelson,* Attorney General of Rhode Island; and *Marshall Coleman,* Attorney General of Virginia, joined by *Emmet Bondurant, David I. Shapiro,* and *James vanR. Springer.* *Allen A. Lauterbach* filed a brief for the American Farm Bureau Federation as *amicus curiae* urging affirmance.

[1] See *Bayside Enterprises, Inc.* v. *NLRB,* 429 U. S. 298 (1977).

Volstead Act, when it employs an independent contractor to tend the chickens during the "grow-out" phase from chick to mature chicken? [2]

The issue apparently is of importance to the broiler industry and in the administration of the antitrust laws. [3]

## I

In April 1973, in the United States District Court for the Northern District of Georgia, the United States brought suit against petitioner National Broiler Marketing Association (NBMA). It alleged that NBMA had conspired with others not named, but including members of NBMA, in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1 (1976 ed.). It prayed for injunctive relief and that NBMA "be ordered to make whatever changes are necessary in its organization and operation to insure compliance with the judgment" of the court. Record 10. In its answer NBMA alleged, among other things, that its status, as a cooperative association of persons engaged in the production of agricultural products, sheltered it from antitrust liability for the acts alleged, under § 1 of the Capper-Volstead Act, also known as

---

[2] The Court of Appeals described the issue in this manner:

"We must decide whether broiler industry companies that neither own nor operate farms can be 'farmers' within the meaning of a 1922 federal statute called the Capper-Volstead Act, which gives farmers' cooperatives some measure of protection from the antitrust laws" (footnote omitted). 550 F. 2d 1380, 1381 (CA5 1977).

[3] Nineteen States have filed a brief *amicus curiae* and assert interests as antitrust litigants. See *In re Chicken Antitrust Litigation*, M. D. L. No. 237, ND Ga. No. C74–2454A. See also Brown, United States v. National Broiler Marketing Association: Will the Chicken Lickin' Stand?, 56 N. C. L. Rev. 29 (1978); Department of Agriculture, Farmer Cooperative Service, Legal Phases of Farmer Cooperatives (1976); Note, Trust Busting Down on the Farm: Narrowing the Scope of Antitrust Exemptions for Agricultural Cooperatives, 61 Va. L. Rev. 341 (1975).

the Cooperative Marketing Associations Act, 42 Stat. 388, 7 U. S. C. § 291 (1976 ed.).[4]

On motion and cross-motion for partial summary judgment, the District Court concluded that the involvement of all the members of NBMA in the production of broiler chickens was sufficient to justify their classification as "farmers," within the meaning of the Act, and that NBMA therefore was a cooperative entitled to the limited exemption from the antitrust laws the Act afforded. 1975–2 Trade Cases ¶ 60,509.

On appeal,[5] the United States Court of Appeals for the Fifth Circuit reversed. It held that all the NBMA members were not farmers in the ordinary, popular meaning of that word and

---

[4] Section 1 of the Capper-Volstead Act provides in pertinent part:

"Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes . . . ."

The statute further provides that any such association must be operated for the mutual benefit of its members; that it may not pay dividends of more than 8% annually on its stock or membership capital; and that it "shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." Section 2 of the Act, 7 U. S. C. § 292 (1976 ed.), provides for certain regulation of the association by the Secretary of Agriculture.

[5] In order to facilitate the appeal, the United States, after the District Court's decision, amended the complaint to limit its allegations of conspiracy to the members of NBMA. App. 94–95. This was done without prejudice to any later renewal of allegations abandoned by the amendment. *Id.*, at 91. Noting that the United States did not dispute that if NBMA were a qualified cooperative, the exemption afforded by the Capper-Volstead Act provided a complete defense to the amended complaint, and restating its conclusion that NBMA's members were entitled to join in a cooperative under the Act, the District Court dismissed the amended complaint with prejudice. *Id.*, at 105–108; 1976–1 Trade Cases ¶ 60,801.

as it was employed in 1922 when the Capper-Volstead Act became law. 550 F. 2d 1380 (1977). Because of the importance of the issue for the agricultural community and for the administration of the antitrust laws, we granted certiorari. 434 U. S. 888 (1977).

## II

NBMA is a nonprofit cooperative association organized in 1970 under Georgia law.[6] It performs various cooperative marketing and purchasing functions on behalf of its members. App. 7.[7] Its membership has varied somewhat during the course of this litigation, but apparently it has included as many as 75 separate entities. *Id.*, at 172.

These members are all involved in the production and marketing of broiler chickens.[8] Production involves a number of distinct stages: the placement, raising, and breeding of breeder flocks to produce eggs to be hatched as broiler chicks;

---

[6] Georgia Cooperative Marketing Act, Ga. Code § 65–201 *et seq.* (1975). The Act authorizes cooperative associations of "persons engaged in the production of . . . agricultural products." § 65–205. When first organized, NBMA was chartered as a cooperative association with capital stock. In December 1973, after the complaint in this suit had been filed, its articles of incorporation were amended to authorize the cancellation of its capital stock and the conversion of the association to a nonprofit membership cooperative association not having stock. App. 6.

There is no suggestion by the parties that this change in organization in any way affects the issue presented in the case.

[7] The record includes more specific but nevertheless limited references to NBMA's activities. It has been involved in the purchasing of feed ingredients and of other specialized products used by its members in raising broilers and preparing them for market, in market research and planning, and in conducting a foreign trade sales program. *Id.*, at 137–139. The full range of NBMA's activities may well be put in issue on remand.

[8] Broilers are chickens that are slaughtered at 7 to 9 (or 8 to 10) weeks of age and processed for sale to supermarkets, restaurants, hotels and other institutions. *Id.*, at 8, 93, 98. The United States has conceded that, for the purposes of this litigation, a broiler chicken is an agricultural product. *Id.*, at 7.

the hatching of the eggs and placement of those chicks; the production of feed for the chicks; the raising of the broiler chicks for a period, not to exceed, apparently, 10 weeks; the catching, cooping, and hauling of the "grown-out" broiler chickens to processing facilities; and the operation of facilities to process and prepare the broilers for market. *Id.*, at 7.

The broiler industry has become highly efficient and departmentalized in recent years,[9] and stages of production that in the past might all have been performed by one enterprise may now be split and divided among several, each with a highly specialized function. No longer are eggs necessarily hatched where they are laid, and chicks are not necessarily raised where they are hatched. Conversely, some stages that in the past might have been performed by different persons or enterprises are now combined and controlled by a single entity. Also, the owner of a breeder flock may own a processing plant.

All the members of NBMA are "integrated," that is, they are involved in more than one of these stages of production. Many, if not all, directly or indirectly own and operate a processing plant where the broilers are slaughtered and dressed for market. All contract with independent growers for the raising or grow-out of at least part, and usually a substantial part, of their flocks. *Id.*, at 8. Often the chicks placed with an independent grower have been hatched in the member's hatchery from eggs produced by the member's breeder flocks.

---

[9] Compare, for example, Department of Agriculture, Agricultural Adjustment Administration, W. Termohlen, J. Kinghorne, & E. Warren, An Economic Survey of the Commercial Broiler Industry (1936), with V. Benson & T. Witzig, The Chicken Broiler Industry: Structure, Practices, and Costs (Dept. of Agriculture, Economic Rep. No. 381, 1977). See generally E. Roy, Contract Farming and Economic Integration, ch. 4, "Broiler Chickens" (2d ed. 1972); Department of Agriculture, Packers and Stockyards Administration, The Broiler Industry: An Economic Study of Structure, Practices and Problems (1967); Ohio Agricultural Research and Development Center, B. Marion & H. Arthur, Dynamic Factors in Vertical Commodity Systems: A Case Study of the Broiler System (1973).

The member then places its chicks with the independent grower for the grow-out period, provides the grower with feed, veterinary service, and necessary supplies, and, with its own employees, usually collects the mature chickens from the grower. Generally, the member retains title to the birds while they are in the care of the independent grower. *Ibid.*

It is established, however, *ibid.;* Brief for Petitioner 5 n. 2, that six NBMA members do not own or control any breeder flock whose offspring are raised as broilers, and do not own or control any hatchery where the broiler chicks are hatched. And it appears from the record that three members do not own a breeder flock or hatchery, and also do not maintain any grow-out facility.[10] These members, who buy chicks already hatched and then place them with growers, enter the production line only at its later processing stages.

## III

The Capper-Volstead Act removed from the proscription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market.[11] But if the cooperative includes among its members those not so privileged under the statute to act collectively, it is not entitled to the protection of the Act. *Case-Swayne Co.* v. *Sunkist Growers, Inc.,* 389 U. S. 384 (1967). Thus, in order for NBMA to enjoy the limited exemption of the Capper-Volstead Act, and, as a consequence, to avoid liability under the antitrust laws for its collective activity, *all* its members must be qualified to act collectively. It is not enough that a typical

[10] See Table G–1, and the data as to Members 2, 3, and 20, attached to affidavit of I. R. Barnes, submitted by petitioner and accepted as to accuracy by the United States. Record 467; App. 187–188.

[11] The Act does not remove from the general operation of the antitrust laws the dealings of such cooperatives with others. *United States* v. *Borden Co.,* 308 U. S. 188, 203–205 (1939).

member qualify, or even that most of NBMA's members qualify. We therefore must determine not whether the typical integrated broiler producer is qualified under the Act but whether all the integrated producers who are members of NBMA are entitled to the Act's protection.

The Act protects "[p]ersons engaged in the production of agricultural products *as farmers, planters, ranchmen, dairymen, nut or fruit growers*" (emphasis added). A common-sense reading of this language [12] clearly leads one to conclude that not all persons engaged in the production of agricultural products are entitled to join together and to obtain and enjoy the Act's benefits: The italicized phrase restricts and limits the broader preceding phrase "[p]ersons engaged in the production of agricultural products . . . ." [13]

---

[12] See *Malat* v. *Riddell*, 383 U. S. 569, 571 (1966); *Addison* v. *Holly Hill Fruit Products, Inc.*, 322 U. S. 607, 618 (1944).

[13] The report on the bill that became the Act stressed that the limitations on "the kind of associations to which the legislation applies" were "aimed to exclude from the benefits of this legislation all but actual farmers and all associations not operated for the mutual help of their members as such producers." H. R. Rep. No. 24, 67th Cong., 1st Sess., 1 (1921). See also H. R. Rep. No. 939, 66th Cong., 2nd Sess., 1 (1920).

Senator Kellogg, a supporter of the bill, read this language to have a restrictive meaning:

"Mr. CUMMINS . . . . Are the words 'as farmers, planters, ranchmen, dairymen, nut or fruit growers' used to exclude all others who may be engaged in the production of agricultural products, or are those words merely descriptive of the general subject?

"Mr. KELLOGG. I think they are descriptive of the general subject. I think 'farmers' would have covered them all.

"Mr. CUMMINS. I think the Senator does not exactly catch my point. Take the flouring mills of Minneapolis: They are engaged, in a broad sense, in the production of an agricultural product. The packers are engaged, in a broad sense, in the production of an agricultural product. The Senator does not intend by this bill to confer upon them the privileges which the bill grants, I assume?

"Mr. KELLOGG. Certainly not; and I do not think a proper construction of the bill grants them any such privileges. The bill covers

The purposes of the Act, as revealed by the legislative history, confirm the conclusion that not all those involved in bringing agricultural products to market may join cooperatives exempt under the statute, and have the cooperatives retain that exemption. The Act was passed in 1922 to remove the threat of antitrust restrictions on certain kinds of collective activity, including processing and handling, undertaken by certain persons engaged in agricultural production. Similar organizations of those engaged in farming, as well as organizations of laborers, were already entitled, since 1914, to special treatment under § 6 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 17 (1976 ed.).[14] This treatment, however, had proved to be inadequate. Only nonstock organizations were exempt under the Clayton Act, but various agricultural groups had discovered that, in order best to serve the needs of their members, accumulation of capital was required. With capital, cooperative associations could develop and provide the handling and processing services that were needed before their members' products could be sold. The Capper-Volstead Act was passed to make it clear that the formation of an agricultural organization with capital would not result in a violation of the antitrust laws, and that the organization, without

---

farmers, people who produce farm products of all kinds, and out of precaution the descriptive words were added.

"Mr. TOWNSEND. They must be persons who produce these things.

"Mr. KELLOGG. Yes; that has always been the understanding." 62 Cong. Rec. 2052 (1922).

[14] Section 6 of the Clayton Act reads:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

antitrust consequences, could perform certain functions in preparing produce for market. Mr. Justice Black summarized this legislative history in his opinion for a unanimous Court in *Maryland & Virginia Milk Producers Assn.* v. *United States,* 362 U. S. 458, 464–468 (1960), and it is further discussed in *Case-Swayne,* 389 U. S., at 391.[15]

Farmers were perceived to be in a particularly harsh economic position. They were subject to the vagaries of market conditions that plague agriculture generally, and they had no means individually of responding to those conditions. Often the farmer had little choice about who his buyer would be and when he would sell. A large portion of an entire year's labor devoted to the production of a crop could be lost if the farmer were forced to bring his harvest to market at an unfavorable time. Few farmers, however, so long as they could act only individually, had sufficient economic power to wait out an unfavorable situation. Farmers were seen as being caught in the hands of processors and distributors who, because of their position in the market and their relative economic strength, were able to take from the farmer a good share of whatever

---

[15] See also, *e. g.,* 59 Cong. Rec. 7851–7852 (1920) (remarks of Rep. Morgan); *id.,* at 8017 (remarks of Rep. Volstead). See generally Ballantine, Co-operative Marketing Associations, 8 Minn. L. Rev. 1 (1923); L. Hulbert, Legal Phases of Cooperative Associations 43–47 (Department of Agriculture Bull. No. 1106, 1922).

The Court specifically has acknowledged the relationship of the exemption for labor unions and that for farm cooperatives:

"These large sections of the population—those who labored with their hands and those who worked the soil—were as a matter of economic fact in a different relation to the community from that occupied by industrial combinations. Farmers were widely scattered and inured to habits of individualism; their economic fate was in large measure dependent upon contingencies beyond their control." *Tigner* v. *Texas,* 310 U. S. 141, 145 (1940).

See also *Liberty Warehouse Co.* v. *Tobacco Growers,* 276 U. S. 71, 92–93 (1928); *Frost* v. *Corporation Comm'n,* 278 U. S. 515, 538–543 (1929) (Brandeis, J., dissenting).

profits might be available from agricultural production.[16]   By allowing farmers to join together in cooperatives, Congress hoped to bolster their market strength and to improve their ability to weather adverse economic periods and to deal with processors and distributors.

NBMA argues that this history demonstrates that the Act was meant to protect all those that must bear the costs and risks of a fluctuating market,[17] and that all its members, because they are exposed to those costs and risks and must make decisions affected thereby, are eligible to organize in exempt cooperative associations.[18]   The legislative history indicates, however, and does it clearly, that it is not simply exposure to those costs and risks, but the inability of the individual farmer to respond effectively, that led to the passage of the Act.   The congressional debates demonstrate that the Act was meant to aid not the full spectrum of the agricultural sector but, instead, to aid only those whose economic position rendered them comparatively helpless.   It was, very definitely, special-interest legislation.   Indeed, several attempts were made to amend the Act to include certain processors who, according to preplanting contracts, paid growers amounts based on the market price of processed goods; these attempts were roundly rejected.[19]   Clearly, Congress did not intend to extend the

---

[16] See, e. g., 59 Cong. Rec. 8025 (1920) (remarks of Rep. Hersman); id., at 9154 (extended remarks of Rep. Michener); 61 Cong. Rec. 1040 (1921) (remarks of Rep. Towner); 62 Cong. Rec. 2048–2049 (1922) (remarks of Sen. Kellogg); id., at 2058 (remarks of Sen. Capper).

[17] Essentially the same argument was made and rejected by the Court in Case-Swayne Co. v. Sunkist Growers, Inc., 389 U. S. 384, 393–396 (1967), in which it concluded that a cooperative of orange growers, which included some members who operated packing houses but grew no fruit, was not entitled to the protection of the Act.

[18] NBMA asserts that the integrator bears 90%, or more, of broiler production costs, as compared with the grower's 10%, or less.   Tr. of Oral Arg. 13; Brief for Petitioner 16, 21.

[19] This amendment, repeatedly introduced by Senator Phipps, would have

benefits of the Act to the processors and packers to whom the farmers sold their goods, even when the relationship was such that the processor and packer bore a part of the risk.

Petitioner suggests that agriculture has changed since 1922, when the Act was passed, and that an adverse decision here "might simply accelerate an existing trend toward the absorption of the contract grower by the integrator," or "might induce the integrators to rewrite their contracts with the contract growers to designate the latter as lessor-employees rather than independent contractors." Brief for Petitioner 13; see *id.*, at 24, 26, and Tr. of Oral Arg. 17. We may accept the proposition that agriculture has changed in the intervening 55 years, but, as the second Mr. Justice Harlan said, when speaking for the Court in another context, a statute "is not an empty vessel into which this Court is free to pour a vintage that we think better suits present-day tastes." *United States v. Sisson,* 399 U. S. 267, 297 (1970). Considerations of this kind are for the Congress, not the courts.

## IV

We, therefore, conclude that any member of NBMA that owns neither a breeder flock nor a hatchery, and that maintains no grow-out facility at which the flocks to which it holds title are raised, is not among those Congress intended to protect by the Capper-Volstead Act. The economic role of such a member in the production of broiler chickens is indistinguish-

inserted the following language after "nut or fruit growers" (see n. 4, *supra*):

"and where any such agricultural product or products must be submitted to a manufacturing process, in order to convert it or them into a finished commodity, and the price paid by the manufacturer to the producer thereof is controlled by or dependent upon the price received by the manufacturer for the finished commodity by contract entered into before the production of such agricultural product or products, then any such manufacturers." 62 Cong. Rec. 2227, 2273–2275, 2281 (1922).

828

able from that of the processor that enters into a preplanting contract with its supplier, or from that of a packer that assists its supplier in the financing of his crops.[20] Their participation involves only the kind of investment that Congress clearly did not intend to protect.[21] We hold that such members are not "farmers," as that term is used in the Act, and that a cooperative organization that includes them—or even one of

---

[20] The dissent suggests, *post*, at 849, that petitioner's members "partake in substantially all of the risks of bringing a crop . . . from chick to broiler." Although it is true that petitioner's members bear some of the risks associated with bringing each flock to market, they do not bear all the risks. Growers dealing with many of petitioner's members, including M2, M3, and probably M20, receive no payment for their labor if a flock is lost due, in some cases, to the weather, and in other cases, to disease. See Table G–2, App. 195. And, perhaps more importantly, petitioner's members do not bear all the risks associated with changes in demand over a longer period of time. Very few of petitioner's members, not including M2 or M3, provide the growers with whom they deal anything more than "informal assurances" that the member will continue to place flocks with the grower and therefore that the grower will receive a return on the investment he has in his grow-out facilities. See Table G–7, App. 219.

[21] Because we conclude that these members have not made the kind of investment that would entitle them to the protection of the Act, we need not consider whether, even if they had, they would be ineligible for the protection of the Act because their economic position is such that they are not helplessly exposed to the risks about which Congress was concerned. Thus we need not consider here the status under the Act of the fully integrated producer that not only maintains its own breeder flock, hatchery, and grow-out facility, but also runs its own processing plant. Neither do we consider the status of the less fully integrated producer that, although maintaining a grow-out facility, also contracts with independent growers for a large portion of the broilers processed at its facility.

There is nothing in the record that would allow us to consider whether these integrators are "too small" to own their own breeder flocks, hatcheries, or grow-out facilities, or whether, because of the history of their economic development, they have concentrated only on the feed production and processing aspects of broiler production.

them—as members is not entitled to the limited protection of the Capper-Volstead Act.

The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings.

*It is so ordered.*

Mr. Justice Brennan, concurring.

I join the Court's opinion. I agree that since several of NBMA's members were not engaged in the production of agriculture as farmers, *Case-Swayne Co.* v. *Sunkist Growers, Inc.,* 389 U. S. 384 (1967), compels the holding that NBMA's activities challenged by the United States cannot be afforded the Sherman Act exemption NBMA asserts. Since that disposition settles this aspect of the suit between the parties, it is unnecessary for the Court to consider, and the Court reserves, the question of "the status under the Act of the fully integrated producer that not only maintains its breeder flock, hatchery, and grow-out facility, but also runs its own processing plant." *Ante,* at 828 n. 21. I write separately only to suggest some considerations which bear on this broader question. I do so because the rationale of the dissent necessarily carries over to that question.

I

The Capper-Volstead Act, 42 Stat. 388, 7 U. S. C. § 291 *et seq.* (1976 ed.), like the Sherman Act which it modifies, was populist legislation which reacted to the increasing concentrations of economic power which followed on the heels of the industrial revolution. The Sherman Act was the first legislation to deal with the problems of participation of small economic units in an economy increasingly dominated by economic titans. Next enacted was § 6 of the Clayton Act, 38 Stat. 730, 15 U. S. C. § 17 (1976 ed.), which provides:

> "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and oper-

ation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws."

This legislation linked industrial labor and farmers as the kind of economic units of individuals for whom it was thought necessary to permit cooperation—cartelization in economic parlance—in order to survive against the economically dominant manufacturing, supplier, and purchasing interests with which they had to interrelate. The failure of § 6 expressly to authorize cooperative marketing activities, and to permit capital stock organizations coverage under it, prompted enactment of the Capper-Volstead Act in 1922 to remedy these omissions. Section 1 of that Act provides, *inter alia:*

"Persons engaged in the production of agricultural products' as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. . . ."

At the time the Capper-Volstead Act was enacted, farming was not a vertically integrated industry. The economic model was a relatively large number of small, individual, economic farming units which actually tilled the soil and husbanded animals, on the one hand, and, on the other hand, the relatively small number of large economic units which processed the agricultural products and resold them for wholesale and retail distribution. It was the disparity of power between the units at the respective levels of production that spurred

this congressional action. See, *e. g.*, 62 Cong. Rec. 2257 (1922) (remarks of Sen. Norris). Congress was concerned that the farmer, at the mercy of natural forces on one hand, and the economically dominant processors on the other, was being driven from the land and forced to migrate in ever-increasing numbers to the cities.

> "Senator Capper stated a point of view to be found on almost every page of the congressional debate on his bill, 'Middlemen who buy farm products act collectively as stockholders in corporations owning the business and through their representatives buy of farmers, and if farmers must continue to sell individually to these large aggregations of men who control the avenues and agencies through and by which farm products reach the consuming market, then farmers must for all time remain at the mercy of the buyers.' 62 Cong. Rec. 2058 (1922)." *Post,* at 841 (footnote omitted).

The legislative history makes clear that the regime which Congress created in the Capper-Volstead Act to ameliorate this situation was one of voluntary cooperation. The Act would allow farmers to " 'combine with [their] neighbors and cooperate and act as a corporation, following [their] product from the farm as near to the consumer as [they] can, doing away in the meantime with unnecessary machinery and unnecessary middle men.' That is all this bill attempts to do." 62 Cong. Rec. 2257 (1922) (remarks of Sen. Norris). As the Court notes, however, "[c]learly, Congress did not intend to extend the benefits of the Act to processors and packers to whom the farmers sold their goods, even when the relationship was such that the processor and packer bore a part of the risk." *Ante,* at 826–827. This fact is demonstrated from several exchanges during the debate clarifying the intent behind the bill and also by the abortive Phipps amendment. In the colloquy between Senators Kellogg and Cummins, quoted *in extenso, ante,* at 823–824, n. 13, an intent not

to extend the benefits of the bill to processors of agricultural products is clear:

> "Mr. CUMMINS . . . Take the flouring mills of Minneapolis: They are engaged in a broad sense, in the production of an agricultural product. The packers are engaged in a broad sense, in the production of an agricultural product. The Senator does not intend by this bill to confer upon them the privileges which the bill grants, I assume?
>
> "Mr. KELLOGG: Certainly not . . . ." 62 Cong. Rec. 2052 (1922).

Debate surrounding the proposed Phipps amendment, quoted *ante*, at 827 n. 19, the effect of which would have been to exempt, for example, sugar refiners with preplanting contracts, yields a similar understanding. Senator Norris, in leading the successful rejection of the amendment, explained: "The amendment . . . is simply offered for the purpose of giving to certain manufacturers the right to be immune from any prosecution under the Sherman Antitrust Act. . . . *They are not cooperators;* they are not producers; it is not an organization composed of producers who incorporate together to handle their own products; that is not it." 62 Cong. Rec. 2275 (1922) (emphasis added). These statements show that Congress regarded both "manufacturers of finished agricultural products" and "processors" as ineligible. Whether or not there is a distinction in economic or other terms between "manufacturers" who refine sugar from beets, or "processors" who mill wheat into flour, both groups were thought of as beyond the reach of § 1—"They are not cooperators." Thus the legislative history demonstrates that the purpose of the legislation was to permit only individual economic units working at the farm level[1] to form cooperatives for purposes of

---

[1] See, *e. g.*, 59 Cong. Rec. 7855–7856 (1920) (remarks of Rep. Evans: "[T]he liberty sought in this bill for the man who tills the soil"); *id.*, at

"collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged." This focus on collectives to replace the processors and middlemen is the key to application of the Act's policies to modern agricultural conditions.

## II

### A

The dissent is correct, of course, that "[t]he nature of agriculture has changed profoundly since the early 1920's when the Capper-Volstead Act was debated and adopted. The reality of integrated agribusiness admittedly antiquates some of the congressional characterizations of farming." *Post*, at 843. Most NBMA members are fully integrated, except for the grow-out stage which they contract out. Rather than groups of single-function farmers forming a collective jointly to handle, process, and market their agricultural products, these multifunction integrated units stand astride several levels of agricultural production which Congress in 1922 envisioned would be collectivized. Performing these functions for them-

---

8017 (remarks of Rep. Volstead); *id.*, at 8022 (remarks of Rep. Sumners); *id.*, at 8025 (remarks of Rep. Hersman); *id.*, at 8026 (remarks of Rep. Towner: "[T]his privilege is not to dealers or handlers or speculators for profit; it is limited to the producers themselves"); *id.*, at 8033 (remarks of Rep. Fields); 61 Cong. Rec. 1034 (1921) (remarks of Rep. Walsh); *id.*, at 1037 (remarks of Rep. Blanton); *id.*, at 1040 (remarks of Rep. Towner: "The farmer is an individual unit. He must manage his own farm. He must have his own home"); *id.*, at 1044 (remarks of Rep. Hersey); 62 Cong. Rec. 2048, 2050 (1922) (remarks of Sen. Kellogg, noting the "individualistic nature of the farmer's occupation" and describing a farmer as "a small holder of land"); *id.*, at 2051 (remarks of Sen. Kellogg, observing that the legislation was designed to encourage the farmer "in his ownership, in the occupation of his farm, and in the cultivation of his own land"); *id.*, at 2052 (remarks of Sens. Cummins, Kellogg, and Townsend); *id.*, at 2156 (remarks of Sen. Walsh, observing that the legislation protects only "an organization of the producers themselves of the product of the farm"); *id.*, at 2058–2059 (remarks of Sen. Capper).

selves, the allegations of the complaint suggest, they now seek protection of the exemption not to permit collectivized processing but simply as a shield for price fixing. The issue is whether a fully integrated producer of agricultural products performing its own processing or manufacturing and which hence does not associate for purposes of common handling, processing, and marketing is nevertheless "engaged in the production of agricultural products as [a] farme[r]" for purposes of § 1's exemption for such cooperatives if also engaged in traditional farming activity. The dissent frankly recognizes that integrated poultry producers do not neatly fit the limitation Congress signified by the phrase "as farmers," but reads that limitation out of the Act in order to give effect to what it perceives as Congress' desire to aid the agricultural industry generally because of the uncertainty of profits in that industry caused by the combination of weather, fluctuations in demand, and perishability of the product. Elision of the limitation Congress placed on the exemption is sacrificed to this end, and the exemption extended to encompass all persons engaged in the production of agriculture. But that drastic restructuring of the statute is not only inconsistent with Congress' specific intent regarding the meaning of the limitation, but is unnecessary to give continuing effect to its broader purposes. Congress clearly intended, as the discussion in Part I, *supra*, demonstrates, to withhold exempting processors engaged in the production of agriculture notwithstanding that they bore risks common to agriculture generally, and that they may be "price takers" with respect to the product they sell to large chains of grocery stores. The dissent fails to explain how extending the exemption in the fashion it suggests can be reconciled with the fundamental purpose of this populist legislation to authorize farmers' cooperatives for collective handling, processing, and marketing purposes.

The dissent's construction, it seems to me, would permit the behemoths of agribusiness to form an exempt association

to engage in price fixing, and territorial and market division, so long as these concerns are engaged in the production of agriculture. It is hard to believe that in enacting a provision to authorize horizontal combinations for purposes of collective processing, handling, and marketing so as to eliminate middlemen, Congress authorized firms which integrated further downstream beyond the level at which cooperatives could be utilized for these purposes to combine horizontally as a cartel with license to carve up the national agricultural market. Such a construction would turn on its head Congress' manifest purpose to protect the small, individual economic units engaged in farming from exploitation and extinction at the hands of "these large aggregations of men who control the avenues and agencies through and by which farm products reach the consuming market," 62 Cong. Rec. 2058 (1922) (remarks of Sen. Capper), by exempting instead, and thereby fomenting "these great trusts, these great corporations, these large moneyed institutions" at which the Sherman Act took aim. 21 Cong. Rec. 2562 (1890) (remarks of Sen. Teller). There is nothing in the legislative history, and much to the contrary, to indicate that Congress enacted § 1 to remake agriculture in the image of the great cartels.

### B

Definition of the term "farmer" cannot be rendered without reference to Congress' purpose in enacting the Capper-Volstead Act. "When technological change has rendered its literal terms ambiguous, the . . . Act must be construed in light of [its] basic purpose." *Twentieth Century Music Corp.* v. *Aiken,* 422 U. S. 151, 156 (1975). I seriously question the validity of any definition of "farmer" in § 1 which does not limit that term to exempt only persons engaged in agricultural production who are in a position to use cooperative associations for collective handling and processing—the very activities for which the exemption was created. At some point along the path of downstream integration, the function of the

exemption for its intended purpose is lost, and I seriously doubt that a person engaged in agricultural production beyond that point can be considered to be a farmer, even if he also performs some functions indistinguishable from those performed by persons who are "farmers" under the Act. The statute itself may provide the functional definition of farmer as persons engaged in agriculture who are insufficiently integrated to perform their own processing and who therefore can benefit from the exemption for cooperative handling, processing, and marketing. Thus, in my view, the nature of the association's activities, the degree of integration of its members, and the functions historically performed by farmers in the industry are relevant considerations in deciding whether an association is exempt. The record before us does not provide evidence relevant to these considerations, and there is therefore no basis for appraising NBMA's entitlement to the exemption while it includes members whose operations are fully integrated whether or not they contract rather than perform the grow-out phase.

## III

If, because of changes in agriculture not envisioned by it in 1922, Congress' purpose no longer can be achieved, there would be no warrant for judicially extending the exemption, even if otherwise it would fall into desuetude. In construing a specific, narrow exemption to a statute articulating a comprehensive national policy, we must, of course, give full effect to the specific purpose for which the exemption was established. But when that purpose has been frustrated by changed circumstances, the courts should not undertake to rebalance the conflicting interests in order to give it continuing effect. Cf. *Teleprompter Corp.* v. *Columbia Broadcasting System, Inc.,* 415 U. S. 394, 414 (1974); *Fortnightly Corp.* v. *United Artists,* 392 U. S. 390, 401–402 (1968). Specific exemptions are the product of rough political accommodations responsive to the time and current conditions. If the passage of time

has "antiquated" the premise upon which that compromise was struck, the exemption should not be judicially reincarnated in derogation of the enduring national policy embodied in the Sherman Act.

The dissent's reconstruction of the exemption is doubly flawed, for it would frustrate the Act's purpose to protect that segment of agricultural enterprise as to which Congress' purpose retains vitality. The American Farm Bureau Federation, which has filed a brief *amicus curiae* in this case, "is a voluntary general farm organization, representing more than 2.5 million member families in every State (except Alaska) and Puerto Rico." Brief as *Amicus Curiae* 2. Speaking for the contract growers—those who actually own the land and husband the chicks from the time they are hatched until just before their slaughter—the Federation argues that extending the exemption to integrators would stand the Act on its head; the integrators who process the fully grown broilers could thereby combine to dictate the terms upon which they will deal with the contract growers to the latter's disadvantage.

Moreover, there is persuasive evidence that Congress' concern for protecting contract growers vis-à-vis processors and handlers has not abated. In 1968, Congress enacted the Agricultural Fair Practices Act of 1967, 82 Stat. 93, 7 U. S. C. § 2301 *et seq.* (1976 ed.), designed to protect the "bargaining position" of "individual farmers" by prohibiting "handlers" from interfering with the "producers'" right "to join together voluntarily in cooperative organizations as authorized by law." § 2301. In doing so, Congress legislated specifically to protect contract growers from integrated broiler producers. Section 4 (b) of the Act prohibits a "handler" from discriminating against "producers" with respect to any term "of purchase, acquisition or *other handling of* agricultural products because of his membership in or contract with an association of producers." 7 U. S. C. § 2303 (b) (1976 ed.) (emphasis added). The definition of the term "producer" is identical to that in

§ 1 of Capper-Volstead, see 7 U. S. C. § 2302 (b) (1976 ed.), but the legislative history makes clear that for purposes of this Act, Congress considered integrated broiler producers to be "handlers" and acted to prevent them from preying on contract growers. The Senate Report makes this clear: [2]

> "As introduced, [§ 4 (b)] prohibited discrimination in the terms of 'purchase or acquisition' of agricultural products. The committee found that this provision would be ineffective with respect to much that it was manifestly intended to prohibit. *Thus a broiler contractor might furnish hatching eggs or chicks to a producer under a bailment contract where title remained in the contractor;* or a canning company might furnish seeds or tomato plants to a producer under a similar arrangement. *No 'purchase or acquisition' would be involved.* The committee amendment would extend this provision to 'other handling' of agricultural products, thereby covering the examples just given and greatly broadening the scope of this provision." S. Rep. No. 474, 90th Cong., 1st Sess., 5–6 (1967). (Emphasis added.)

---

[2] Secretary Freeman, in recommending passage of the Agricultural Fair Practices Act, on behalf of the United States Department of Agriculture, said:

"Cooperative action in agricultural production and marketing is increasing. It is growing in response to the need, (1) to achieve more orderliness and efficiency in production and marketing, and (2) to protect and improve bargaining relationships between producers and marketing firms in the face of major changes taking place in the marketing system.

*"These changes include the growing integration of production and marketing of agricultural products, the increased control of these functions by large, diversified corporations, and the expanded use of contracting by such corporations to meet their needs. Developments such as these weaken the marketing and bargaining position of individual producers."* Hearings on S. 109 before a Subcommittee of the Senate Committee on Agriculture and Forestry, 90th Cong., 1st Sess., 3–4 (1967). (Emphasis added.)

The anomaly of allowing the exemption to those who function more as processors uniquely to disadvantage the contract grower "producers" who today continue to fall within the conception of "farmers" Congress envisioned in 1922, points up the danger of judicially extending the exemption to conditions unforeseen by Congress in 1922.[3] The exemption provides a powerful economic weapon for the benefit of one economic interest group against another. However desirable the integrated broiler production system may be, and however needful of the exemption,[4] judges should not readjust the conflicting interests of growers and integrators; it is for Congress to address the problem of readjusting the power balance between

---

[3] The dissenting opinion finds helpful in refuting the construction of the exemption suggested in this opinion two brief excerpts from the legislative history, quoted *post,* at 848 n. 14. These statements merely indicate that a processor like "Mr. Armour" who operates a farm would be entitled, free from antitrust liability, to cooperate with other producers in the common handling, processing, and marketing of the products they grow. Nothing in these statements suggests that the fact of farm ownership, however, would confer upon "Mr. Armour" the privilege to conspire with "Mr. Swift" to fix prices in their *processing* businesses. The dissent's assertion, moreover, that the third proviso of 7 U. S. C. § 291 (1976 ed.) allows a food processor by becoming a producer as well to acquire antitrust exemption for whatever he produces and up to 50% of the product of others is surely erroneous. Both the plain language of the proviso and the statement of Senator Walsh quoted indicate that the privilege to process up to 50% of nonmember producers' products while retaining the exemption belongs to the exempt association, not its members. Indeed, the full colloquy between Senators Kellogg and Walsh indicates that the intent was to exclude processors from the exemption with respect to their processing. "The object being that a few farmers should not organize a corporation simply as a selling agency and not personally really be cooperative members." 62 Cong. Rec. 2268 (1922) (remarks of Sen. Kellogg).

The statement of Senator Kellogg quoted, moreover, refers to an amendment which was not passed and which is simply irrelevant.

[4] See Brown, United States v. National Broiler Marketing Association: Will the Chicken Lickin' Stand?, 56 N. C. L. Rev. 29 (1978).

them. *Teleprompter Corp.*, 415 U. S., at 414; *Fortnightly Corp.*, 392 U. S., at 401–402.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEWART joins, dissenting.

The majority opinion fails to provide a functional definition of what it means to be a farmer within the sense of the Capper-Volstead Act. We are alternatively told that antitrust protection was not intended for "the full spectrum of the agricultural sector, but, instead . . . only those whose economic position rendered them comparatively helpless," *ante,* at 826, and then that certain members of the National Broiler Marketing Association are not entitled to protection because they are not big enough to own their own breeder flock, hatchery, or grow-out facility, *ante,* at 827. The rule of the case evidently is that ownership of one of those facilities is somehow requisite in order to be a farmer. But no attempt is made to link that conclusion to the motivating factors behind an antitrust exemption for agriculture.

Historically, perishability of produce forced the farmer to take whatever price he could obtain at the time of the harvest. This one factor, more than any other, underlay the legislative recognition that allowing farmers to combine in marketing cooperatives was necessary for the economic survival of agriculture. "It is folly to suggest to the farmer with a carload of cattle on the market to 'take them home' or to 'haul back his load of wheat' or other commodity." 59 Cong. Rec. 7856 (1920) (Cong. Evans).[1]

---

[1] Congressman Evans was commenting on an earlier version of the bill. "[T]he cooperative association is most helpful and its widest field of operation is in those products which are not sold upon exchanges . . . take the fruit crop, the apple crop, the potato crop. It must be harvested at a certain time. . . . You can not dump all the production on the country at once and have the farmer receive a good price." 62 Cong. Rec. 2052 (1922) (Sen. Kellogg). See also *Id.,* at 2263 (Sen. Hitchcock).

Even in a reasonably competitive market, physical inability to withhold produce will place a producer at a disadvantage. But the farmer did not face a reasonably competitive market. A theme running through the legislative history almost as persistently as perishability is the farmer's vulnerability to a small number of middlemen, organized, and capable of driving the price down below the farmer's cost of production.[2] Senator Capper stated a point of view to be found on almost every page of the congressional debate on his bill: "Middlemen who buy farm products act collectively as stockholders in corporations owning the business and through their representatives buy of farmers, and if farmers must continue to sell individually to these large aggregations of men who control the avenues and agencies through and by which farm products reach the consuming market, then farmers must for all time remain at the mercy of the buyers." 62 Cong. Rec. 2058 (1922).[3]

---

[2] See, e. g., Senator Capper's speech, id., at 2058, summing up his support for "growers . . . [who were] compelled to dump [their products] on a glutted market at prices below cost of production."

[3] "Agriculture sells its product to the highest bidder in a restricted market. It sells in this sort of market at the price fixed by purchasers. . . . There must be given to agriculture some compensatory advantage to offset the present economic advantage which industry holds by reason of the fact that it can write into the selling price which it fixes all cost of production plus a profit." 59 Cong. Rec. 8022 (1920) (remarks of Cong. Sumners on an earlier version of the bill). "Operating individually, [the farmer] is helpless and falls an easy victim to the organized operators who deal in his output." Id., at 8025 (remarks of Cong. Hersman on earlier bill). "The farmers are not asking a chance to oppress the public, but insist that they should be given a fair opportunity to meet business conditions as they exist—a condition that is very unfair under the present law. Whenever a farmer seeks to sell his products he meets in the market place the representatives of vast aggregations of organized capital that largely determine the price of his products. Personally he has very little, if anything, to say about the price." Id., at 8033 (remarks of Cong. Fields on earlier bill). The Congressman stressed that the bill would give

The aid extended to farmers by the Capper-Volstead Act was of a very special variety. It was not a system of price supports or surplus purchases. The assistance offered farmers by the Capper-Volstead Act was to allow combination in a way that would otherwise violate the antitrust laws. Such protection was chosen for a specific purpose. A Government price support program could lift price as surely as allowing agricultural cooperatives to operate, if lifting price were the only objective. The specific goal of permitting agricultural organizations was to combat, and even to supplant, purchasers' organizations facing the farmer.

Economics teaches that the result in such circumstances is "bilateral monopoly" with a potentially beneficial impact on the eventual consumer and a sharing of cartel profits between the organized suppliers and the organized buyers.[4] The House Report for this reason concluded that the organization of agricultural cooperatives could actually lead to a lowering of the price paid by consumers,[5] if the middleman were elimi-

---

farmers "protection against the gamblers in agricultural products, who rob the producer with one hand and the consuming public with the other." *Ibid.* The farmer "stands defenseless against combinations of corporations. He finds that when he goes out to do business in the world that he has to do business with a combination that represents 40 or 50 or 100,000 individual incorporators, but the farmer is a unit and he can not incorporate." 61 Cong. Rec. 1040 (1921) (remarks of Cong. Towner on earlier bill). "[I]t is better to have the control of producers extend nearer than now to consumers as against the control of prices by the speculator, who has no concern in the maintenance of stable prices but whose concern is only his immediate profit." *Id.,* at 1041 (remarks of Cong. Sumners on earlier bill). "[Cooperatives] have tended to prevent much of the gambling in foodstuffs and to eliminate many of the useless middlemen that stand between the producers, the retailers, and the consumers." H. R. Rep. No. 24, 67th Cong., 1st Sess., 3 (1921).

[4] See G. Stigler, The Theory of Price 207–208 (3d ed. 1966); M. Friedman, Price Theory 191–192 (1976); G. Becker, Economic Theory 94–95 (1971).

[5] H. R. Rep. No. 24, *supra,* n. 3, at 3.

nated altogether. Senator Norris elaborated that the purpose of the bill was to permit farmers " 'to combine with [their] neighbors and cooperate and act as a corporation, following [their] product from the farm as near to the consumer as [they] .can, doing away in the meantime with unnecessary machinery and unnecessary middle men.' That is all this bill attempts to do." 62 Cong. Rec. 2257 (1922).

The legislative history thus comports with the economic reality of farming, and provides a consistent rationale for an agricultural antitrust exemption. Farmers were price takers because their goods could not be stored, and because they dealt with a small number of well-organized middlemen.

The nature of agriculture has changed profoundly since the early 1920's when the Capper-Volstead Act was debated and adopted. The reality of integrated agribusiness admittedly antiquates some of the congressional characterizations of farming. But this Court has interpreted other statutory exemptions in the light of a changing economy,[6] and the Court errs in failing to apply the sense and wording of the agriculture exemption because the industry's organization has changed.

The important reasons for granting antitrust immunity to farmers have not changed. Their produce is still, in large part, incapable of being withheld for a higher price. And in this case, that factor is particularly relevant. The overwhelming demand is for fresh, not frozen, 8-to-10-week-old broiler chickens, and integrators must sell their produce within four days of slaughter.[7] The result is a buyer's market. And the

---

[6] See, e. g., *Connell Constr. Co. v. Plumbers & Steamfitters*, 421 U. S. 616 (1975) (labor exemption); *Meat Cutters v. Jewel Tea Co.*, 381 U. S. 676 (1965) (labor exemption); and *SEC v. National Securities, Inc.*, 393 U. S. 453 (1969) (concerning the McCarran-Ferguson Act exemption for insurance).

[7] Brown, United States v. National Broiler Marketing Association: Will the Chicken Lickin' Stand?, 56 N. C. L. Rev. 29, 44 (1978).

buyers in this market are few and powerful: "[T]he market for broilers is oligopsonistic, dominated by large retail chains such as A & P, Kroger and Safeway and institutional food outlets such as Kentucky Fried Chicken." [8] A recurrent pattern of prices below actual cost to the producer has been observed since the start of the current decade.[9]

All of this makes the present case a very poor one in which to depart from the wording of the antitrust exemption for farmers. Broiler chickens are agricultural products.[10] Integrators produce them. Hence, integrators are "persons engaged in the production of agricultural products." They own the "crop" from chicks to dressed broilers.[11] They are engaged in the production of agricultural products as farmers, within the meaning of 7 U. S. C. § 291 (1976 ed.).

The majority's insistence that Capper-Volstead protection not be extended unless the broiler producers own a breeder flock, hatchery, or grow-out facility is sought to be explained by the rationale that "[t]he economic role" of a producer who does not own one of these facilities "is indistinguishable from that of [a] processor that enters into a preplanting contract with its supplier . . . ." *Ante,* at 827–828. Such processors were sought to be included within the Act by Senator Phipps' amendment, which was rejected.

It is inaccurate to equate broiler producers with processors of agricultural commodities, even those with preplanting contracts. Such an equation ignores the important distinction that members of the NBMA are all *producers* of broilers, whereas a mere processor of an agricultural commodity is *not* a producer. The Act extends protection to "[p]ersons engaged in the *production* of agricultural products as farmers."

---

[8] *Ibid.*

[9] *Ibid.*

[10] See *ante,* at 820 n. 8.

[11] For most of the NBMA members, of course, ownership starts even earlier with the eggs produced by their own breeder flock.

(Emphasis added.) Opposition to the Phipps amendment was centered on precisely the fact that it would extend protection to those who did not produce agricultural commodities.

A leading critic explained his opposition: "The amendment . . . is simply offered for the purpose of giving to a certain class of manufacturers the right to be immune from any prosecution under the Sherman Antitrust Act . . . . They are not cooperators; they are not producers; it is not an organization composed of producers who incorporate together to handle their own products; that is not it." 62 Cong. Rec. 2275 (1922) (Sen. Norris). The problem with the proposal, therefore, was not that processing was involved. The statute's own words are conclusive that the activity of processing by producers was to be exempted from antitrust scrutiny.[12] The objection to Senator Phipps' proposal was that processors *who were not also producers* were protected.

This hostility to Senator Phipps' amendment was understandable, given the frequent legislative references to the pernicious effect of middlemen. But NBMA members are not middlemen. Whether or not they own hatcheries or grow-out facilities, they are producers of agricultural commodities.[13]

---

[12] The Act explicitly protects farmers who associate for the purpose of "collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged." And the produce of a cooperative's own members need comprise no more than 50% of the total handled by the cooperative; so it was clear that some members could be doing more processing than producing of agricultural commodities. They would still be entitled to protection because what produce they did raise was contributed to the cooperative.

[13] This fact distinguishes *Case-Swayne Co.* v. *Sunkist Growers, Inc.*, 389 U. S. 384 (1967). Capper-Volstead Act protection was denied to orange growers cooperatives in that case because they included several "nonproducer interests" in the form of orange processors who did not themselves grow any citrus at all. All of the members of NBMA, by contrast, produce broiler chickens. Some contract out various stages of the growing process, but all members own the agricultural product throughout its production, from chick to broiler.

They enter the production system before the chickens are hatched, and withdraw only at the time the dressed broilers are sold. They own the chickens throughout the raising process. They should be allowed to "follo[w their] product from the farm as near to the consumer as [they] can."

There is a functional dimension to this dichotomization of producers and processors. It involves the realities of risk-bearing. The Phipps amendment extended protection to manufacturers who paid a price for raw agricultural products that was "controlled by or dependent upon the price received by the manufacturer for the finished commodity by contract entered into before the production of such agricultural product or products." *Id.,* at 2273. Hence, the risk held in common by the Phipps-type processors and actual producers is only the fluctuation of final market price. All other risks are borne exclusively by the producer, including fluctuating prices for feed and medicine (all of which the producers supply to the grow-out facilities), damage in transit, and risk of death at any point in the growing process. All of these risks are identically suffered by NBMA members, whether or not they own their own breeder flocks, hatcheries, or grow-out facilities, because of the cost-plus nature of the grow-out contracts. The majority unwarrantedly relies upon the fact that the Senate rejected antitrust immunity for Phipps-type processors, who shared only *one* of these risks, to conclude that parties sharing *all* these elements of risk should also be denied protection.

There is cause to applaud the majority opinion in some respects: most importantly in its studious avoidance of any embracing of the United States' point of view. The United States urges that, in determining what subclass of agricultural producers should be considered farmers, attention must focus on ownership of land and husbanding of flocks.

> "The integrators are not 'actual farmers' and do not claim to be so. They do not till the land or husband the flocks. They do not own the land on which the·flocks are raised."
> Brief for United States 14.

"Petitioner therefore draws no sustenance from the fact that both sharecroppers and the owners of sharecropped land may be 'farmers': the sharecroppers work the farmland and the owners own it. Integrators do neither." *Id.,* at 14 n. 28.

Tying antitrust exemption to ownership of land has no legal or economic validity.

Under the United States' theory, an integrator of the type found unprotected in today's opinion could achieve antitrust exemption by purchasing the land on which the grow-out facility was maintained (perhaps leasing it back to the independent "grower"). Or he could achieve protection by hiring his grower as an employee, thereby achieving surrogate status for himself as a husbander of flocks. The anomalous aspect of either of these steps is that antitrust protection would thereby be attained by an expansion of the size of an operation—that is entirely the wrong direction, based on the majority's reading of congressional sentiment (with which I largely concur) that small, nonintegrated farmers were those most to be protected by the Act.[14]

---

[14] The concurring opinion insists that the interpretation presented here "would permit the behemoths of agribusiness to form an exempt association . . . so long as these concerns are engaged in the production of agriculture." *Ante,* at 834–835. If this is a fatal flaw, it is shared equally by the majority opinion, which conditions exempt status on ownership of a breeder flock, hatchery, or grow-out facility. *Ante,* at 827. For all the majority opinion holds, antitrust exemption would apply to the NBMA if only it purged its membership of those integrators *too small* to own their own flock, hatchery, or grow-out facility.

In concluding that the possible extension of any antitrust exemption to large concerns was contrary to congressional intent, the concurring opinion has overlooked several explicit references in the legislative history. These passages demonstrate the point impliedly recognized by the majority opinion and this dissent: that one necessary evil of the bill, accepted by its sponsors, was that just as producers could combine and become processors as well as producers, and yet retain their exemption, large food processors

The United States cites 20 instances from the congressional debates assertedly supporting its view that the proper test involves ownership of land or tilling the soil. Brief for United States 13, and nn. 21–27. Without exception, however, those citations refer to landowning or tilling merely in a shorthand way. It was customary throughout this long debate to observe Representatives and Senators filling pages of the Congressional Record with observations on agriculture's focal role in the American Republic, but one will search in vain for any discussion of why ownership of land was a logical prerequisite to antitrust exemption for a farmer who, in re-

------

could, by becoming producers, fall within the protection of the Act for whatever they produced (and up to 50% of the product of others not even eligible for exemption. 7 U. S. C. § 291 (third proviso) (1976 ed.)). In light of these explicit passages, the thrust of the concurring opinion's search of the legislative history is largely blunted.

"The Senator from Ohio [Mr. POMERENE] at the last session of the Senate inquired very pertinently whether that provision would not, for instance, permit Mr. Swift or Mr. Armour, or Mr. Wilson, each of whom, I undertake to say, owns a farm and raises hogs, for instance, to organize under this proposed act and deal in the products of their own farms, and also to buy extensively from other producers. I think that that could be accomplished under the House bill. Recognizing that there is an evil there, and that the act might easily be abused, the Senate bill provides that such organizations cannot deal in products other than those produced by their members to an amount greater than the amount of the products which they get from their members. So that if the three gentlemen to whom I refer should organize an association under this proposed law, they could throw the product of their own farms into the association and could put just so much more into the business, but no more." 62 Cong. Rec. 2157 (1922) (Sen. Walsh).

"[W]e have not given the farmers the power to organize a complete monopoly. This amendment applies to every association, whether it is a monopoly or an attempt to create a monopoly or not, for it provides that any association must admit anyone who is qualified. If Mr. Armour should be a farmer he would have to be admitted; if a sugar manufacturer should happen to raise a little sugar he would have to be admitted." *Id.,* at 2268 (Sen. Kellogg).

sponse to the strains of price taking, joined an agricultural marketing association.

The cumulative weight of the legislative history is that antitrust protection was needed for the cooperative efforts of those unable to combine in corporate form, whose product was thrown on the market in inelastic supply, where it faced an elastic demand. Perishability of agricultural product figured far more realistically than ownership of land as a reason for the inelastic supply of farmers' produce at market time. And it was that inelastic supply that made farmers so very vulnerable to oligopsonistic demand. Put plainly, farmers had to sell but middlemen did *not* have to buy.

Antitrust exemption should be extended to agricultural producers who partake in substantially all of the risks of bringing a crop from seed to market, or, in this case, from chick to broiler. This is what it means to be a farmer. This rule would not exempt mere processors of agricultural produce, as the Phipps amendment had sought to do. It does not tie antitrust exemption to the irrelevant criterion of ownership of land, or tilling of the soil. But it does prove faithful, in a way the majority formulation does not, to the economic realities underlying Congress' concern for agriculture: the perishability of product and organization of purchaser that make the individual farmer a price taker.

I respectfully dissent.