**AKRON MILK PRODUCERS, INC., Plaintiff, v. LAWSON MILK COMPANY, Defendant.**

Common Pleas Court, Summit County.

No. 209989.   Decided January 2, 1958.

Buckingham, Doolittle & Burroughs, Herman Rabe, Stuart H. Russell, for plaintiff.

Brouse, McDowell, May, Bierce & Wortman, Charles Iden, for defendant.

## OPINION

By CLANDE V. D. EMMONS, J.:

This action is one for injunctive relief primarily, wherein the Akron Milk Producers, Inc., hereinafter referred to as the Association, is asking the Court in its prayer to permanently enjoin the defendant, The Lawson Milk Company, hereinafter referred to as Lawson, from:—

1. Engaging in, authorizing, encouraging or approving any conduct designed to induce, or attempting to induce any producer members of the Plaintiff Association to breach, cancel or terminate their marketing agreements with the Plaintiff.

2. From authorizing, encouraging or instructing any of its agents, and in particular those persons engaged in hauling milk from the farms of the individual producer members of the Plaintiff Association to Defendant's plant, or other designated delivery stations for delivery to Defendant, to cease hauling milk to said points by reason of the membership of such individual producer members in the Plaintiff Association and from interfering in any way or manner with the orderly transportation of milk of the farms of individual producer members of the Plaintiff to the plant or designated stations of the Defendant.

3. From engaging, authorizing, encouraging or approving any refusal to purchase milk produced by producer members of Plaintiff Asso-

ciation for the reason that such producers are members of the Plaintiff Association.

Considering part 1 of the prayer the Court finds that there was an attempt made by agents and representatives of Lawson to get certain member producers to breach their contract with the Association. This is evidenced by Plaintiff's Exhibits 21, 22, 23, and 24, which consisted of letters written to the Association by members thereof, induced by Lawson, withdrawing or resigning from membership in the Association not in accordance with the terms of the contract between the producers and the Association. The pertinent part of the contract is as follows:—

"Ninth: This contract, if signed by both parties hereto, shall become effective as of the date signed by the producer and shall remain in effect until cancelled as follows:—

"After the first six months, either party desiring to cancel shall serve notice on the other not more than 60 days nor less than 30 days before the end of any subsequent six months of his or its desire to cancel * * * The cancellation shall then be effective on the six months or yearly anniversary of the date of the signing * * *"

The letters of withdrawal or resignation were dated the latter part of December 1955, and they were not such as were requests for cancellation within the terms of the Association-Producer contract.

An attempt to induce or to cause a breach of contract establishes prima facie evidence of legal malice and this must be overcome by evidence proving justification which was not forth coming in this case.

While the Association did not accept these withdrawals or resignations because the producers were trying to breach their contract, nevertheless the attempt to get these producers to breach their contract with the Association was induced by Lawson or its representatives. (See 10 Ohio Circuit Court 558, Dannerberg v. Ashley.) This was not an attempt to induce the member producers to terminate their contracts legally, but to breach them.

Since under the existing circumstances there was no justification of such action, the Court is of the opinion that Lawson should be enjoined from engaging in, authorizing, encouraging, or approving any conduct designed to induce or attempting to induce any producer member of the Association to breach their contract with the Association.

Concerning the question of termination of contract, the Court is impressed that there is ample proof to the effect that Lawson's representatives attempted to induce and persuade the member producers to legally terminate their contract with the Association.

The Court is aware that under the Federal and State laws Agricultural Cooperatives such as the Plaintiff Association are favored entities, however excepting for a few exceptions, these bodies or organizations are amenable to the same general laws as are individuals and corporations.

**75 Oh Ap 25, Leibovitz v. Central National Bank** (cited by the Association). This is the case of a third party being an intermeddler and one who had no concern as to the parties involved and the syllabus is as follows:—

"Where one wrongfully interferes with the performance of an executory contract, which would be carried out except for such interference, he is liable to a party to such contract for damages sustained as the result of such interference."

The turning point in this case rested on the word "wrongfully." Without specifically stating so, the Court recognized that justification was a defense to an action for business interference. This recognized defense of justification was relied on in **Horth v. American Aggregate Corp., 20 O. O. 76**:—

Syllabus 1:—

"It is not a malicious inducement of a breach of contract for a person to enter into an agreement with another person with knowledge that such other person has a contract with a third person covering the same subject matter and that both contracts can not be performed."

This would appear to be contrary to the decision in the Leibovitz case until we discover the "nubbin" in this case, for the Court on page 82 made this statement:

"It is not unlawful for one, by fair and lawful persuasion, to interfere with contracts of another where made with honest intent to improve one's own business."

E. R. Squibb & Sons v. Ira J. Shapiro, Inc.—64 N. Y. Supplement 2nd, 368, Syllabus 2:—

"A corporation which had exclusive agency contract for the sale of manufacturers product under contract, providing that appointment may be terminated at any time by manufacturer or corporation on ten days notice in writing to the other, was not entitled to recover damages from those who allegedly induced the manufacturer to terminate the contract in accordance with the terms of the contract."

It is claimed by the Association that the actions of Lawson in attempting or causing termination of contracts between producers and Association were prompted solely through a desire to injure the Association. This is not borne out by the testimony for in fact it was Lawson's competitive interest that was the prompting factor and not primarily a motivation brought about through hatred, ill will or a desire to injure.

Re-instatement of the Law of Torts—page 77 (H):—

"The privilege stated in this section is given to advance the actor's competitive interest * * * If his conduct is directed, at least in part to that end, it is immaterial that he is also motivated by other impulses as for example, hatred or a desire for revenge."

Representatives of the Association admitted that they were instrumental in getting independent producers to terminate their contract with Lawson and then obtain them as members of the Association—this is the same thing the Association is complaining about as concerns Lawson.

In Fort v. People ex rel Cooperative Farmers Exchange, 256 Pacific Reporter, page 325, the Court noted on pages 328 and 329:—

"A woman tells her friends that in her opinion X sells better goods and sells them at a lower price than does Y, and advises them to transfer their patronage from the latter to the former. They follow her

advice * * * C employs hundreds of men in his factory. A manufacturer of machinery induces C to install machinery and this results in the discharge of many men. In these instances, and in thousands of similar instances, business and occupations are interfered with—sometimes disastrously to those affected—but such interference is lawful and cannot be enjoined."

Where one has genuine business purposes in open competitive fields, that one has the right to compete for the products of another or for the business of the consumer. As there is a legal right to advertise and persuade the consumer to purchase merchandise from a seller so there is equal right for one to compete for the supplies of a producer. No association of men can have greater privileges than the individual simply for the reason that the Federal and State Governments favor that group. Could not two individuals vie one with another in competition to obtain customers? If there can be a competitive field for customers, then the converse is also true that individuals could compete for sources of supply. As individuals can conduct themselves so can other legal entities All too long have we been regimented in daily life. Free enterprise is a thing rapidly disappearing behind clouds of socialism. It is about time the day of the clear sky of individual freedom be seen again.

This Court has always favored Unions and Cooperative Associations as necessary adjuncts for the raise in the standard of living of the working man and farmer, but at the same time that favoritism cannot supersede or be paramount to the Court's duty in preserving and protecting the legal rights of others.

Barn v. Dairymen's League Cooperative Association, 220 Appellate Division, 624, the Court stated:—

"It seems obvious that Cooperatives must attain their goal by economic pressure, legitimately applied and without resorting to practices and acts, which if committed by a less favored corporation or private individual, would not be countenanced by a Court of Equity."

Sorenson v. Chevrolet Motor Company, 214 Northwestern 754, the Court stated:—

"Every act done by a business man in diverting trade from a competitor to himself is an act intentionally done and when successful is an injury to the competitor—but it is not wrong.

HyGrade Dairies v. Falls City Milk Producers Association, 86 Southwestern 2nd, 1046 on page 50, the Court incorporated the views of the trial court, and which were in part as follows:—

"The Association was free at any time to refuse to sell milk of its members and free to refuse to let its members sell their milk to him (Handler) direct."

As I have indicated I am not pronouncing the thought that Lawson can encourage, or in any way attempt to get producer members to breach their contract with the Association, but in the spirit of business competition Lawson's representatives may argue their advantages and persuade producers to enter into contracts with them, orally or otherwise, and to encourage the producers to legitimately terminate their contract with the Association or any other group.

No injunction will be granted prohibiting Lawson from engaging, authorizing, encouraging or approving any conduct designed to induce, or attempting to induce any producer members of the Association to terminate their marketing contract with the Association.

Concerning part 3 of the prayer for injunctive relief, which part herein is referred to as part 2 in this opinion, the Court finds that the haulers were not employees, agents, or special agents of Lawson and therefore any conversation had between them and third parties not in the presence of the representatives of Lawson will not be considered for any purpose. However, assuming that this conversation did bind Lawson, it is not such as would cause the Court to issue an injunction in respect to this claim.

The last part of the prayer is to enjoin Lawson from engaging in, authorizing, encouraging or approving any refusal to purchase milk produced by producer members of Plaintiff Association for the reason that such producers are members of the Plaintiff Association.

The conduct of Lawson which prompted this part of the prayer was by writing a letter to all 116 producer members of the Association informing them that as of the close of business October 31, 1957 Lawson would discontinue taking their supply of milk. However, it was agreed between the parties that Lawson would not discontinue the supply until this case had been decided and the Court purposely did not decide this matter until after January 1, 1958 in order to allow the producer members of the Association to maintain or build up their milk quota which is established during the months of October, November, and December of each year.

For some years Lawson had been dealing with the Association, accepting the supply of milk of 116 producer members of the Association. The parties were not governed by any contract excepting that Lawson would pay the producer members for milk delivered to it and the members would pay their dues to the Association proportionate to the amount of milk delivered to Lawson.

There was uncontroverted testimony that Lawson had a daily surplus of some 10,000 gallons for some months and that under the circumstances Lawson had to cut down the supply. On October 23, 1957, R. J. Lawson, the President, wrote the producers a letter, the purport of which is as follows:—

"We are dropping all member producers of the Akron Milk Producers, Inc. (Association) because the unusual heavy milk production this Fall which has created a surplus too large for us to handle. We would like to retain all farmers who are presently supplying us with milk but we cannot use all the milk currently shipped to us.

"We are dropping the Akron Milk Producers (Association) members because they belong to a group whose purpose is to provide them with a market for their milk. If we were to drop independent producers who have no contract with any association guaranteeing them a market. they would have no help in selling their production * * *"

The 116 members of the Association supplied Lawson with some 5,500 gallons of milk a day and the officers of Lawson testified that the

difference between the 10,000 gallons total surplus and the 5,500 would be assumed by Lawson for the reason that the 4,500 gallons came from independent producers.

The Association contends that Lawson has no right to select these 116 members and discontinue purchasing their supply of milk, but rather suggests that the supply be curtailed by cutting off the last 116 producers who are shipping milk to Lawson, or to cut off those whose milk contained a lower content of butter fat, or to have Lawson take the entire supply and convert into powdered milk, or to ship the surplus to the Cleveland market.

It is admitted that one of the concerns presented here is that if Lawson does not continue to accept this supply of milk from the producer members, that the Association will have to sell this milk for what they can realize and make up the difference so that the individual producer member loses nothing. The Association contracted with its members to do exactly that and while it may concern them to the extent of a loss of around $700.00 per day, it is a contingency for which they contracted to meet. The membership of the Association at present is over 1,500—the members affected 116—the average dues per member is between $100 and $130 per year.

The Association by contract promises to secure a market for its members but instead of shouldering its responsibility, the Association is attempting to find ways and means of unloading this burden and duty to the shoulders of Lawson, where it does not belong.

Lawson is justified in the stand it has taken in being fearful of what the Association may do to their milk supply if the Association controlled the milk producers. Practically every account in the Association News Bulletins concerning Lawson reeked with suspicion and ridicule of Lawson. As for example in the Ohio Milk Producers Bulletin for May, 1954, the following appeared:—

"The local newspaper recently broke the news that the Lawson Milk Company had dropped the milk price in their stores 2c per gallon on gallon jug containers only. The news account stated that Lawson could offer no reason for the drop except that they were making another saving possible for the consumer.

"Pure Baloney; * * * Such claims are pure nonsense * * * It is difficult for this editor to understand how producers can continue to furnish milk willingly to any buyer who would ruthlessly set about to bring ruin and destruction upon a milk market . . . A company that would advertise as they did in the Friday, May 21 issue of the Hartville News that, 'We are the pace-setter in reduction of milk prices.' The same ad went on to say that the 'Gallon jug plan was born during the depression when Lawson saw city dwellers driving to the country with vinegar jugs to buy unpasteurized milk from farmers because they could not afford milk at home-delivered prices.'

"Pass the hankies, please—'tis a very sad tale indeed.—* * *

"The 'pay' line came at the close of the ad when the article said that the company figured that they had saved Akron and Canton consumers more than $3,000,000 dollars in a year. Probably did. It cost

local farmers by themselves more than $65,000 during March, 1954 alone!
* * *"

In the publication for March and April, 1957 there appeared the following article:

### Thanks For Nothin'

"Thanks for nothin'. The Lawson Milk Company form letter to milk shippers claimed that producer prices would be 'protected.' Big deal!"

In the March and April of 1957 Bulletin there also appears the following:—

### More Baloney!

"One thing is certain. There is more baloney in the milk business than in the meat business!

"For the second time in 2½ months, the Lawson Milk Company lowered the retail price of gallon milk * * * It's good to know, however, that Milk-producers in Akron are protected (not by the Lawson company) but by Akron's federal order number 60. * ¹ *"

In the May-June publication, 1957, this item appeared:

### Lawson Goofs

"Apparently that 'Lawson influence' with its depression-day retail prices goofed somewhere * * *"

In **Superior Dairy Inc., Appellant, v. The Stark County Milk Producers Association, et al, Appellees, 89 Oh Ap 26, Syllabus 3:**—

"It is not a violation of the Valentine Anti-trust Act of Ohio for a company organized under the Cooperative Agricultural Marketing Act of Ohio to refuse delivery of milk to a distributor until the latter agrees to terminate a policy of discounts, where the Company is under no obligation to deliver milk other than the implied obligation of the distributors to pay for such milk as delivered."

Under this opinion, if a Co-op (Association) gained control of the milk supply in this or any other district it would be in a legal position to dictate supply and prices as long as such was not contrary to the Federal Order. The Association could under these circumstances force Lawson either to go beyond the realms of this district or even the state to get its supply or it would be driven out of business, and with the hostile attitude displayed by the Association against Lawson, that is the very thing that this Court could reasonably anticipate. The law would not tolerate such a condition to exist—for in effect its true pronouncement is that the Association has the right to refuse to deliver milk to any handler they see fit as long as there is no governing contract and in the same breath says to Lawson you have the right to discontinue taking milk from any producer you see fit whether a member of the Association or not.

The Association contends that if Lawson be allowed to drop these 116 members, it would exploit these individual farmers and drive them out of the dairy business. However, the Federal Order fixes a minimum price for which the handlers such as Lawson must pay for the milk. There is some doubt in the Court's mind as to whether the Association has not already found an adequate market for the milk supply of these

116 members. For in one of the Association publications there appeared the following article:—

"Be calm is the advice of the Association office. Almost immediately Akron Milk Producers, Inc. (Association) secured an alternate Cleveland market for the milk—if such a market is actually needed when worse comes to worse. A Cleveland market will assure the threatened farm members of full protection of the eligible quota which they are now establishing. The Association immediately guaranteed all members at the Lawson Company that The Akron Milk Producers Inc. (Association) would stand behind its promise to provide both a market for the milk and the same blend price as is paid by Lawson to all his other producers."

Courts when interpreting statutes are bound to take cognizance of legislative policy but this practice does not extend to the right of the Courts to make judicial legislation and read into the law, matters that are not contemplated or covered by the statutes. It is true that Co-operatives (Association) in Ohio are not given as much protection as is given in some other states, however this Court cannot because of that fact make judicial legislation. If more protection should be had, the Cooperatives (Association) should apply to the proper division of government, namely the Ohio Legislature, and not the Courts.

The Association by asking for an injunction against Lawson, which would in fact order Lawson to take milk from the producer members, is in fact seeking the Court's aid in making a contract where originally none existed.

The Association is asking the Court to compel Lawson to continue taking milk from its 116 members but at the same time those members could quit delivering their supply to Lawson at any time they chose to do so.

If the Court were to order a contract to be made contrary to the wishes of one of the parties where in the first instance no contract existed, it would be directing specific performance of a contract to which only one party has concurred. It would in effect have the Court say, "Lawson you cannot cease to take from the Association because the producers are members thereof even though you have no contract with the Association, and at the same time say however, the Association may quit delivering milk to you, Lawson, at any time it may choose. This would be an absurd pronouncement of the law of contracts.

**Bretz v. W. C. L. Insurance Company, 134 Oh St 171,** the Court in its opinion on page 177 stated:—

"A Court will not decree specific performance of a contract having no existence. Courts will compel parties to perform contracts in accordance with their terms, but they have no power to and will not make contracts for persons and compel the execution of them."

It is apparent that if the Court were to sustain the injunction and compel Lawson to accept this milk, it would require a continuing supervision by the Court and the Courts of Ohio have consistently refused to order specific performance of contracts which would require continuing supervision by the Courts.

The Association further contends that by reason of the finding of Judge Harvey made in the case of Akron Milk Producers v. Reiter and Harter Inc. et al, being Case No. 205168 in the Common Pleas Court of Summit County Ohio that this Court should hold to the same opinion. However, this opinion was never journalized and since the Court speaks through its journal entries, there is no official pronouncement in that case.

In the case of the Milk Producers Federation of Cleveland, Inc. v. The Lawson Milk Co. et al, being case No. 201238 in the Common Pleas Court of Summit County, Ohio, Judge Harvey issued a temporary restraining order (without notice) which order was later modified by agreement between the parties as a temporary order only and since the order is only a temporary one effected by agreement there is no official pronouncement in this case.

The Court finds that Lawson cut off producer members only because by contract the Association guaranteed them a market for the sale of their milk without loss to them, whereas the independent producers had no such guarantee; that Lawson was in fear that the Association would soon be in a position to force Lawson to pay more for milk or cut off its supply and force it to go to distant places for an adequate supply, or go out of business. What further evidence of justification is necessary, if there must be justification? In competitive markets business concerns have the right generally to select the parties with whom they wish to transact business and these concerns may discontinue that business at any time they wish as long as there is no governing contract.

It is therefore the opinion of this Court that:

1. Under the law the Association is a legal entity favored by law only to the extent that if the organization is established under and in conformity to the governing laws §1729.01 R. C.—§1729.28 R. C., inclusive, then the law declares that an Association is not a conspiracy, a combination in restraint, an illegal monopoly or an attempt to lessen competition or to fix prices arbitrarily but aside from this favoritism the Association is governed by General Corporation Law. (Sec. 1729.27 R. C.)

2. That there was some evidence that Lawson attempted to get some producer members to breach their contract with the Association so that insofar as this practice is concerned injunctive relief will apply as prayed for.

3. That the Court is of the opinion that Lawson may have the right in the spirit of competition and furtherance of business to persuade or indulge producer members to legally terminate their contract with the Association.

4. That there is no evidence to warrant an injunction against the haulers and others for acts as were set forth in the prayer of the petition which was referred to herein as part 2.

5. That Lawson has the right to discontinue business with the Association or Association member producers under the circumstances as were found existing.