DENES et al., Appellees,

v.

COUNTRYMARK, INCORPORATED et al., Appellants.

[Cite as *Denes v. Countrymark, Inc.* (1989), 64 Ohio App.3d 195.]

Court of Appeals of Ohio,
Madison County.

No. CA88–11–025.

Decided Sept. 11, 1989.

*Jones, Day, Reavis & Pogue, David C. Crago* and *Charles R. Saxbe,* for appellees.

*Shumaker, Loop & Kendrick, David W. Wicklund* and *Jeffrey S. Creamer,* for appellants.

*Per Curiam.*

This is an appeal by defendants-appellants, Countrymark, Inc. and Landmark, Inc., from a decision of the Madison County Court of Common Pleas granting partial summary judgment in favor of plaintiffs-appellees, Rudolph Denes, W. Earl Downey, Earlan L. Farling and the Franklin County Farm Bureau, Inc., who are former preferred shareholders of Landmark.

Countrymark is an agricultural cooperative organized with capital stock. It came into existence following a 1985 merger between the Ohio Farmers Grain and Supply Association and Landmark. Prior to the merger, Ohio Farmers and Landmark were competing cooperatives operating primarily in Ohio.

In the early 1980s, both Landmark and Ohio Farmers experienced operating losses and working capital shortages due to the depressed agricultural economy. In late 1983, their boards of directors began considering the possibility of merger. They concluded that by combining their operations they could compete more effectively and again have a profitable operation.

As the merger discussions continued, they encountered two major problems. First, R.C. Chapter 1729, which governs cooperatives, contains no merger provisions. It does, however, provide that the other code provisions relating to corporations, R.C. 1701.01 to 1702.58, apply except when they conflict with R.C. Chapter 1729. Accordingly, they had to determine whether to proceed under the merger provisions of R.C. Chapter 1701, which governs for-profit corporations, or R.C. Chapter 1702, which governs nonprofit corporations. The difference between the two is that R.C. Chapter 1701 provides for voting and dissenting rights of preferred shareholders while R.C. Chapter 1702 does not.

They found no Ohio case law directly on point. In fact, the only authority they discovered was a 1969 opinion from a former Ohio Secretary of State, saying that the nonprofit corporation provisions applied. Since that opinion was old, they decided to seek another opinion. In July 1984, they asked the Secretary of State to affirm the 1969 opinion. The response was that the merger could proceed under the provisions for nonprofit corporations.

Second, Landmark had two significant contingent liabilities that could have adversely affected its financial condition. Ohio Farmers expressed concern that a straight merger would subject its shareholders to these potential liabilities. To avoid this problem, they developed a "plan for unification" which involved a reverse triangular merger. Under this plan, Ohio Farmers would create a wholly owned subsidiary, Subsidiary, Inc., which would merge with Landmark. Ohio Farmers would change its name to Countrymark and would exchange newly issued Countrymark stock for all Landmark stock. As a result, Landmark would become a wholly owned subsidiary of Countrymark.

In March 1985, Landmark and Ohio Farmers sent a notice to all of their common and preferred shareholders informing them that a special shareholders' meeting would be held on April 3, 1985. A notice of hearing and information statement was included describing the details of the merger. It stated that a fairness hearing would be held before the Ohio Division of Securities on April 1, 1985 and invited all interested shareholders to attend. It

also contained a section entitled "voting rights," which stated that while the law was unsettled, Landmark and Ohio Farmers did not intend to recognize voting rights other than those of the common (member) shareholders.

On April 1, 1985, a hearing was held before the Ohio Division of Securities in which Landmark and Ohio Farmers presented evidence on the general fairness of the merger. Appellees did not attend the hearing or object to the merger. The Ohio Division of Securities approved the issuance of shares by Countrymark, exempting those shares from the provisions of R.C. Chapter 1707, the Ohio "blue sky" laws.

On April 3, 1985, at shareholder meetings of Landmark and Ohio Farmers, the merger was approved by a substantial majority of the members. Appellees, as preferred shareholders of Landmark, did not vote or attempt to vote their shares. Appellee Denes stated in an affidavit that, based on the notice he received, it was his understanding that he would not be allowed to vote on the merger proposal. Therefore, he did not attend the meeting or attempt to vote his shares.

The merger became effective May 1, 1985. Since that time, appellants have not paid a dividend on the preferred stock. Also, the contingent liabilities facing Landmark have not been fully resolved.

On March 13, 1987, appellees filed a class action complaint which contained three claims for relief. In their first claim, they alleged that they were entitled to vote on the merger and, since they were not permitted to vote, the merger was void. They demanded that the merger be set aside. In the event this was impracticable, they demanded that the exchange of Landmark stock for Countrymark stock be set aside and that their shares be redeemed at par value plus declared and unpaid dividends. In their second claim, they alleged fraud in connection with Ohio securities laws and, in their third claim, they alleged common-law fraud.

On July 2, 1987, appellants filed a motion for summary judgment on all three claims. Appellees did not file their own motion for summary judgment. Nevertheless, they did file a memorandum opposing the motion for summary judgment in which they urged the trial court to grant summary judgment in their favor. In a decision and entry dated March 4, 1988, the trial court denied appellants' motion for summary judgment, finding that the merger provisions relating to for-profit corporations applied and, therefore, Landmark preferred shareholders had the right to vote on the merger. The trial court entered summary judgment for appellees on their first claim for relief.

Appellants filed a motion for reconsideration which was denied by the trial court. In an entry dated October 17, 1988, the trial court entered final

judgment for appellees on their first claim for relief and determined that there was no "just cause for delay" pursuant to Civ.R. 54(B). This appeal followed.

In their sole assignment of error, appellants state that the trial court erred in denying their motions for summary judgment and for reconsideration, and in granting partial summary judgment in favor of appellees. They argue that the merger provisions of R.C. Chapter 1702, governing nonprofit corporations, applied and that appellees, as nonmember preferred shareholders of Landmark, were not entitled to vote on the merger. Alternatively, they argue that even if R.C. Chapter 1701, governing for-profit corporations, did apply, appellees still were not entitled to vote on the merger. They also argue that the trial court improperly granted partial summary judgment in favor of appellees when they did not file a motion for summary judgment.

To resolve the issues in this case, it is necessary to understand the nature of cooperatives. A cooperative is, in its broadest sense, "an economic association for self help," a "voluntary organization of persons with a common interest, operated along democratic lines for the purpose of providing services at cost to its members and other patrons, who supply both capital and business." Farmer Cooperative Service, U.S. Dept. of Agriculture, Legal Phases of Farmer Cooperatives (Information 100 1976) 2.

The Farmer Cooperative Service of the United States Department of Agriculture provides a more complete definition:

"A cooperative is a voluntary contractual organization of persons having a mutual ownership interest in providing themselves a needed service(s) on a nonprofit basis. It is usually organized as a legal entity to accomplish an economic objective through joint participation of its members. In a cooperative the investment and operational risks, benefits gained, or losses incurred are shared equitably by its members in proportion to their use of the cooperative's services. A cooperative is democratically controlled by its members on the basis of their status as member-users and not as investors in the capital structure of the cooperative." *Id.* at 4.

A cooperative may be incorporated, issue capital stock, and have some outside investors. In cooperatives using capital stock, the member producers receive shares of common stock. Preferred shares are sold to nonmembers who receive a fixed dividend and do not participate in the daily operation of the cooperative.

While a cooperative may be organized like a for-profit corporation, there are three fundamental concepts that distinguish it from other forms of business enterprises. First, the members of the cooperative, those who use its services, must own and control it.

"The first of these distinctive concepts is that the *ownership and control of the enterprise must be by those who utilize its services.* The control is exercised by the owners as the patrons of the business rather than by the owners as investors in the business. In no other form of business enterprise is there a comparable patron-owner relationship. Such a relationship means that the primary objective of the cooperative enterprise is to do the job assigned to it at a minimum of cost and with maximum satisfaction for its owner-patrons. In contrast, the primary objective of nonpatron firms is to maximize returns over costs for the benefit of the owner-investors. * * * [T]he voting control of the business is restricted in various ways to help ensure that the user is dominant over the investor orientation. Traditionally, control has been on a one-man, one-vote basis regardless of the amount any individual has invested. * * * " (Emphasis in original.) Kohls and Downey, Marketing of Agricultural Cooperatives (4 Ed.1972) 208.

"[T]he cooperative association belongs to the members or patrons rather than to outside interests or creditors. * * * [T]hese members exercise democratic control over their organization." General Principles and Problems of Cooperatives: An Introduction (1954), 1954 Wis.L.Rev. 533, 533. Since a true cooperative association is designed to benefit its members, these members must wholly own and control the association. *Id.* at 536.

The second concept is that cooperatives operate on a cost basis. Any returns above cost are returned to the members or patrons on an equitable basis. In a noncooperative business, earnings or profits belong to the business for distribution, or use in the business. In cooperatives, earnings are a liability owed to the patrons. The cooperative itself operates on a nonprofit basis. Kohls and Downey, *supra,* at 208–209.

While cooperatives are considered nonprofit, they are actually hybrid in nature. A cooperative seeks to undertake profitable ventures like any other business. However, the profits accrue to the member-owners through their use of the cooperative instead of to owners as investors. *Id.* at 209.

The third concept is that return on the member-owner's invested capital is limited.

" * * * The capital requirements of a cooperative may be no different from those of any other type of business organization engaged in similar activities. However, the relationship of the investor to the business is quite different. In a cooperative the patron-owner invests his money primarily so that the organization may provide desired services for him. His decision to enter or remain as a patron-owner of the cooperative is made largely on the basis of his opportunity to benefit as a patron-user. In noncooperative forms of business, investors offer their money in expectation of a profitable return on

it. The need for capital may be as urgent for a cooperative as for any other kind of business, but the methods of capital accumulation must acknowledge the fact that returns on the capital are limited." Kohls and Downey, *supra*, at 209.

Rather than receiving direct financial benefits from the invested money, members "choose benefits resulting from better service to members, higher prices for products sold through, and lower prices for products bought from" the cooperative. General Principles and Problems of Cooperatives, *supra*, at 534.

Cooperatives were originally formed to aid farmers who, at the mercy of natural and economic forces, had to be "price takers."

"Agricultural production is a peculiarly precarious area of the national economy. Because of production's dependency upon acts of God, a farmer cannot predict the amount of crop his land will yield in a given season. He may suffer economically from a very large yield as well as from a small one. Obviously, if the land yields a meager crop the farmer has little to sell and therefore earns very little. When there is a bumper crop, the large supply drives prices down, and the farmer's profit is again reduced. Farmers suffer similar adverse consequences when an optimum crop has been produced, if that supply is not wisely distributed but over-supplied to some markets and not supplied to others. Finally, since an individual farmer cannot produce enough of a crop to affect significantly the availability of that crop to the consumer markets, he has no ability to set a minimum price for his product. For the last century, farmers and other agricultural producers have attempted to counteract these disadvantages and achieve some economic stability through the development of cooperative associations. * * * " *Case–Swayne, Inc. v. Sunkist Growers, Inc.* (C.D.Cal.1971), 355 F.Supp. 408, 409.

Agricultural cooperatives are uniquely adapted to meet the needs of farmers because they can get for their members, individual businessmen, advantages of group action and some of the advantages of large business corporations. Farmer Cooperative Service, *supra*, at 1.

The question presented in this case is whether the provisions relating to for-profit or nonprofit corporations apply with respect to voting rights. R.C. Chapter 1729 is the enabling act for "agricultural associations," a term used interchangeably with "cooperative." R.C. 1729.27 provides:

"Sections 1701.01 to 1702.58, inclusive, of the Revised Code, and all powers and rights under such sections, apply to an association organized under sections 1729.01 to 1729.27, inclusive of the Revised Code, except where sections 1701.01 to 1702.58, inclusive, of the Revised Code, are in conflict with sections 1729.01 to 1729.27, inclusive, of the Revised Code."

R.C. 1702.42 provides that approval of a merger between nonprofit corporations requires a majority vote of the members of the corporations. A "member" is defined as "one holding membership rights and privileges in a corporation in accordance with its articles or regulations." R.C. 1702.01(H). However, unlike cooperatives, nonprofit corporations do not have nonmember shareholders. Under R.C. 1702.13(B), a nonprofit corporation may issue "certificates evidencing membership" but it is prohibited from issuing shares at all. R.C. 1701.78 allows nonvoting classes of stock in a for-profit corporation to vote under certain limited circumstances.

Because cooperatives are a special type of corporation having characteristics of both for-profit and nonprofit corporations, neither of these statutes can be said to fit perfectly into the cooperative scheme. However, we believe R.C. Chapter 1729 and the principles governing cooperatives generally mandate that the provisions relating to nonprofit corporations be applied in this case.

R.C. 1729.01 expressly provides:

"Associations shall be deemed nonprofit, inasmuch as they are not organized to make profit for themselves as such, *or for their members as such,* but only for their members as producers." (Emphasis added.)

This provision implicitly recognizes that cooperatives operate at cost, making no profit for the cooperative itself. Moreover, the statement that cooperatives do not make a profit for their "members as such, but only for their members as producers" implicitly recognizes the concept that, in a cooperative, the members' return on their investment is limited. The primary benefit the members receive is the advantages of group action and the use of the cooperative's services. The straight financial gain from their shares in the sense of dividends is relatively minor and secondary to the more intangible benefits.

Appellees rely on *Schuster v. Ohio Farmers Coop. Milk Assn.* (C.A.6, 1932), 61 F.2d 337, in which an Ohio cooperative argued that because it was deemed to be nonprofit under G.C. 10186–1, the predecessor of R.C. 1729.01, it could not be placed into involuntary bankruptcy. The Bankruptcy Code applied only to "moneyed, business or commercial" corporations. The Sixth Circuit Court of Appeals found that the Ohio statute did not prevent the Bankruptcy Code from applying. It stated:

" * * * Obviously, the co-operative marketing association is organized for profit in the sense of financial benefit to its members. The element of departure from ordinary corporate economic practice is found in the fact that the financial gain is enjoyed by the members in proportion to the production, by each, of the products handled, rather than in proportion to the capital otherwise contributed by each to the conduct of the business; but this

difference of economic principle governing the distribution of wealth cannot alter the fact that the sole incentive to membership in such an association is the financial benefit to be derived therefrom in the marketing of the farm products which the member is producing. There is nothing broadly eleemosynary in co-operative associations. They simply represent a banding together of producers for their common good, and the motive of each is pecuniary gain." *Id.* at 338.

We do not find this case persuasive. We do not dispute the contention that cooperatives are essentially commercial ventures. However, we believe that *Schuster* simply recognizes the hybrid nature of cooperatives. Additionally, the fact that cooperatives are considered "moneyed, business or commercial corporations" under federal bankruptcy statutes, which have different purposes and policies than Ohio corporation law, is irrelevant to the issue before us. The issue before us is the proper application of Ohio's statutes governing corporations and, under the express terms of R.C. 1729.01, cooperatives are considered nonprofit for the purposes of Ohio corporation law.

Appellees also argue that to apply R.C. Chapter 1702 in this case because cooperatives are legislatively deemed to be nonprofit would mean that R.C. Chapter 1702 alone applies to cooperatives. Thus, the statement in R.C. 1729.27 that R.C. Chapter 1701 also applied to cooperatives would be emasculated, ignoring the legislative mandate that one portion of a statute should not be construed so as to render another portion of a statute meaningless. R.C. 1.47(B). Applying R.C. Chapter 1702 in this case does not mean that R.C. Chapter 1701 will never apply to cooperatives. R.C. Chapter 1701 is more comprehensive than both R.C. Chapter 1702 and R.C. Chapter 1729 and there are situations when it will necessarily have to apply. Moreover, we do not hold that R.C. Chapter 1702 will always take precedence over R.C. Chapter 1701 when a cooperative is involved. As will be seen from our decision, we believe R.C. Chapter 1701 conflicts with the cooperative statutes in this case.

Additionally, the concept that cooperatives must be owned and controlled by its members is implicit in the provisions of R.C. Chapter 1729. R.C. 1729.05 provides that "[f]ive or more persons, a majority of whom are residents of this state and *engaged in the production of agricultural products,* may form a nonprofit co-operative association, with or without capital stock * * *." (Emphasis added.) R.C. 1729.01(C) defines a "member" of a cooperative as being a holder of common stock in an association organized with capital stock. Membership in cooperatives is limited and common stock may only be issued to persons engaged in the production of agricultural products, and other agricultural cooperatives. R.C. 1729.09. Amendments to a cooperative's articles of incorporation must be adopted by a majority of the members. R.C.

1729.07. The board of directors is "elected by the members from their own number." R.C. 1729.13. The members may act to remove officers and directors. R.C. 1729.16. The members may review the decisions of the board of directors. R.C. 1729.17. All of these provisions recognize that cooperatives are designed to benefit agricultural producers and they alone must control its operation.

The Ohio cooperative statutes do recognize the need for outside investors. R.C. 1729.10(H) provides that a cooperative may issue preferred stock which does not have the right to vote. This provision is in conflict with the provisions of R.C. Chapter 1701 which contemplates situations in which nonvoting stock may have the right to vote. See R.C. 1701.06(A)(5).

Appellees argue, and the trial court held, that although nonmember preferred shareholders do not have the right to participate in the business and management of the cooperative, they do have limited voting rights with respect to extraordinary transactions, such as mergers. This argument ignores the express language of R.C. 1729.10(H). Moreover, we believe it defeats the purpose of a cooperative. Landmark's Articles of Incorporation allow for persons who are not agricultural producers to hold preferred stock. If preferred shareholders are allowed to vote on extraordinary transactions, they could easily defeat a merger that the members, the agricultural producers, want or need. They could do so simply by threatening not to vote. This will force merging cooperatives to either abandon their merger plans, or prematurely redeem their preferred stock as a prerequisite to obtaining a successful merger vote. This result would jeopardize the future success of an otherwise beneficial merger by seriously depleting the working capital of the merging cooperatives. Such a result would wrest control from the members in a decision that affects the future of the cooperative. At a time of continuing struggle in the agricultural economy, a valuable management tool would be removed from the hands of Ohio farmers. We do not believe that the Ohio cooperative statutes allow this result.

Moreover, conferring voting rights on nonmember investors may place cooperatives in danger of losing many federal benefits accorded to agricultural cooperatives, *i.e.*, benefits which generally require absolute member control. Member control is often the determinative issue in whether a cooperative is exempt from antitrust laws under the Capper–Volsted Act, Section 229 *et seq.*, Title 7, U.S.Code; whether it is eligible to borrow under the Farm Credit Act, Section 2129, Title 12, U.S.Code; whether it will qualify as a tax-exempt organization under Section 521, Title 26, U.S.Code; and whether it will receive special tax treatment under Sections 1381 to 1388, Title 26, U.S.Code. See, *e.g.*, *Natl. Broiler Marketing Assn. v. United States*

(1978), 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728; *Case–Swayne Co. v. Sunkist Growers, Inc.* (1967), 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621. In Ohio, cooperatives are favored under the law, see *Akron Milk Producers v. Lawson Milk Co.* (1958), 77 Ohio Law Abs. 275, 277, 147 N.E.2d 512, 515, and it is doubtful the legislature intended a result which would jeopardize federal benefits vital to the health of a cooperative.

Therefore, we hold that the provisions of R.C. Chapter 1702, not those of R.C. Chapter 1701, apply to the merger and that appellees, as nonmember preferred shareholders, did not have the right to vote. Thus, although summary judgment may, under certain circumstances, be granted to the non-moving party, the trial court erred in granting summary judgment to appellees on their first claim for relief.

Moreover, we hold that appellants were entitled to judgment as a matter of law on the first claim for relief. Appellees contend that there was some sort of "secret plan" to deprive them of the right to vote and that appellants misrepresented to them that they could not vote on the merger. Although appellees seem to be arguing that there are issues of material fact, since Ohio statutes do not give preferred shareholders the right to vote, this argument is not relevant to the issue now before us. Therefore, appellants' assignment of error is sustained and, pursuant to App.R. 12(A), we enter judgment in favor of appellants on appellees' first claim for relief.

The assignment of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, reversed and judgment is entered for appellants.

*Judgment reversed.*

WILLIAM W. YOUNG, P.J., HENDRICKSON and KOEHLER, JJ., concur.