**CECELIA PACKING CORPORATION, a California corporation, Plaintiff,**

**Harris Farms, Inc., a California corporation; Kencarol, Inc., a California corporation; John Doe One; John Doe Two, a California corporation; and John Doe Three, Plaintiffs–Appellants,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE/AGRICULTURAL MARKETING SERVICE; Sunkist Growers, Inc., Defendants–Appellees.**

No. 92–15671.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 13, 1993.

Decided Nov. 22, 1993.

James A. Moody, Washington, DC, Brian C. Leighton, Fresno, CA, for plaintiffs-appellants.

Robert M. Loeb, U.S. Dept. of Justice, Washington, DC; Michael H. Bierman, Tuttle & Taylor, Los Angeles, CA, for defendants-appellees.

James S. Krzyminski, Washington, DC, for amicus curiae.

Before: SNEED, POOLE, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

This case involves Constitutional challenges to 7 U.S.C. § 608c(12) (1988), the provision of the Agriculture Marketing Agreement Act of 1937 ("AMAA") that requires the Secretary of Agriculture to consider the vote of a producer-cooperative association in a marketing order referendum as representing

the votes of all the association's member-producers. The district court dismissed the complaint pursuant to Fed.R.Civ.P. 12(c), holding that the provision did not deprive the plaintiffs of their Constitutional rights of free speech and equal protection. The panel has jurisdiction of this timely appeal pursuant to 28 U.S.C. § 1291 (1988), and we affirm.

## I

This case challenges procedures followed by the Secretary of Agriculture in conducting referenda to determine whether or not to continue certain marketing orders imposed on navel and Valencia orange producers. A preliminary discussion concerning the history of these marketing orders is required as background prior to addressing the specific issues raised in this case.

### A. *History of Challenged Statute*

#### 1. Marketing Orders in General

"The Agricultural Marketing Agreement Act, 7 U.S.C. § 601 *et seq.,* authorizes the Secretary of Agriculture to issue marketing orders limiting the quantity of commodities shipped into markets identified by the Secretary, thus protecting prices for producers and maintaining orderly marketing conditions. 7 U.S.C. § 602(1)." *Riverbend Farms, Inc. v. Madigan,* 958 F.2d 1479, 1483 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992).

> Marketing orders ... may be issued only after the Secretary complies with the Act's detailed promulgation procedures. The Secretary must first give notice and an opportunity for a hearing upon any proposed order. *See* 7 U.S.C. § 608c(3). After a hearing, if the Secretary finds "that the issuance of such order ... will tend to effectuate the declared policy" of the Act, *id.* § 608c(4), he may submit the proposed order to producers for their approval. An order regarding citrus fruits does not gen-

erally become effective unless handlers of at least eighty percent (80%) of the oranges, and producers of two-thirds (66⅔%) of the oranges or two-thirds (66⅔%) of the producers approve of the Secretary's determination. *Id.* § 608c(8).

*Pescosolido v. Black,* 765 F.2d 827, 828–29 (9th Cir.1985). The Secretary may terminate a marketing order at any time if he or she determines the order obstructs or fails to effectuate the declared policy of the AMAA. 7 U.S.C. § 608c(16)(A).

"Since 1954 the Secretary has enforced marketing orders for the sale of Valencia oranges (and navel oranges) in Arizona and California." *Sequoia Orange Co. v. Yeutter,* 973 F.2d 752, 754 (9th Cir.1992), *amended,* 985 F.2d 1419 (9th Cir.1993). *See also* 7 C.F.R. § 907.1 *et seq.* (navel oranges); 7 C.F.R. § 908.1 *et seq.* (Valencia oranges). Prior to 1985, the Secretary could conduct a referendum at any time to determine whether the orange growers in the region favored continuing the marketing order. *See* 7 C.F.R. §§ 907.83, 908.83 (1984). In 1985, however, the marketing order regulations were amended to require the Secretary to conduct a referendum at a minimum of every six years.[1] 7 C.F.R. §§ 907.83, 908.83 (1993).

> To determine whether continuance is favored by producers, the required percentages set forth in the act with respect to producer approval of the issuance of a marketing agreement and order ... shall be used. In the event that a referendum is utilized to aid in making this determination, such required percentages for continuance shall be held to be complied with if ... the percentage favoring continuance is equal to or in excess of the percentage required.

7 C.F.R. § 907.83(c)(2) (navel oranges); *see also* 7 C.F.R. § 908.83(c)(2) (Valencia oranges) (same language).

---

**1.** In *Sequoia Orange,* the Ninth Circuit held the procedures used by the Secretary to adopt the 1985 amendments were improper pursuant to the Administrative Procedures Act ("APA"). *Sequoia Orange* does not affect the panel's review of the issues in this case, however, because even without the amendments, the Secretary retains the statutory power under the AMAA both to terminate marketing orders and to hold referenda. 7 U.S.C. § 608c(16). In fact, the Secretary expressly invoked those general statutory powers when announcing the 1991 referenda. *See* 56 Fed.Reg. 13290 (1991).

### 2. Congressional Policy on Cooperative Associations

"The [AMAA] was passed in response to unstable marketing conditions during the Depression, with an objective of helping farmers obtain a fair value for their agricultural products." *Pescosolido*, 765 F.2d at 828. Through the provisions of the AMAA, Congress sought "to establish and maintain such orderly marketing conditions for any agricultural commodity enumerated in section 608c(2) of this title as will provide, in the interests of producers and consumers, an orderly flow of the supply thereof to market throughout its normal marketing season to avoid unreasonable fluctuations in supplies and prices." 7 U.S.C. § 602(4). To accomplish this goal, Congress instructed the Secretary of Agriculture to "accord such recognition and encouragement to producer-owned and producer-controlled cooperative associations as will be in harmony with the policy toward cooperative associations set forth in existing Acts of Congress, and as will tend to promote efficient methods of marketing and distribution." 7 U.S.C. § 610(b)(1).

Two of the "existing Acts" referred to in the AMAA clearly support congressional efforts to promote producer cooperatives. In the Agricultural Marketing Act, 12 U.S.C. § 1141 (enacted 1929), Congress declared:

It is declared to be the policy of Congress to promote the effective merchandising of agricultural commodities in interstate and foreign commerce, so that the industry of agriculture will be placed on a basis of economic equality with other industries, and to that end to protect, control, and stabilize the currents of interstate and foreign commerce in the marketing of agricultural commodities and their food product—

. . . .

(3) by encouraging the organization of producers into effective associations or corporations under their own control for greater unity of effort in marketing and by promoting the establishment and financing of a farm marketing system of producer-owned and producer-controlled cooperative associations and other agencies.

12 U.S.C. § 1141(a)(3).

Congress also encouraged cooperatives by providing limited antitrust immunity for such organizations. Pursuant to 7 U.S.C. § 291 (enacted 1922), the "Capper–Volstead Act", orange growers are authorized to act together in associations for the benefit of all. The Act "removed from the proscription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market." *National Broiler Mktg. Assoc. v. United States*, 436 U.S. 816, 822, 98 S.Ct. 2122, 2127, 56 L.Ed.2d 728 (1978). "By allowing farmers to join together in cooperatives, Congress hoped to bolster their market strength and to improve their ability to weather adverse economic periods and to deal with processors and distributors." *Id.* at 826, 98 S.Ct. at 2129.

In line with the policy to encourage producer participation in cooperatives, Congress included in the AMAA the provision challenged in this case, 7 U.S.C. § 608c(12), which provides:

Whenever, pursuant to the provisions of this section, the Secretary is required to determine the approval or disapproval of producers with respect to the issuance of any order, . . . the Secretary shall consider the approval or disapproval by any cooperative association of producers . . . as the approval or disapproval of the producers who are members of, stockholders in, or under contract with, such cooperative association of producers.

### B. *Parties Involved*

Given the nature of the claims involved, the identity of the parties is important. First, defendant-appellee Sunkist Growers, Inc., is a nonprofit cooperative marketing association formed by citrus fruit producers. As a cooperative of producers, Sunkist is entitled to bloc vote pursuant to section 608c(12).

Second, plaintiff-appellant Harris Farms is an independent producer of navel and Valencia oranges.[2]

Third, plaintiff-appellant Kencarol, Inc., a California corporation, is a producer of navel and Valencia oranges, which during the 1989–90 crop year packed and marketed its oranges through Sunkist. At the time of the 1991 referenda, June, 1991, considered to be within the 1990–91 crop year, Kencarol was no longer packing and marketing its oranges through Sunkist. However, pursuant to the rules of the 1991 referendum, Sunkist was entitled to vote on behalf of Kencarol, because voting qualifications were established based upon the 1989–90 crop year; and we so hold.

Finally, plaintiffs-appellants John Does One, Two and Three were producers of navel and Valencia oranges and members of the Sunkist cooperative who wished to vote to terminate the marketing orders.

## C. 1991 Referenda

Pursuant to the six-year requirements found in 7 C.F.R. §§ 907.83, 908.83, the Secretary announced on April 5, 1991, that referenda would be conducted during June, 1991, to determine whether growers favored continuation of marketing order programs for both navel and Valencia oranges. *See* 56 Fed.Reg. 22364. Accordingly, the Secretary mailed ballots to each of the 3750 navel orange producers and the 3560 Valencia orange producers. The Secretary reminded the producers, however, "If a cooperative chooses to bloc vote on behalf of its members, it must do so for all of its members." *See* 56 Fed.Reg. at 22365.

On April 18, 1991, Sunkist announced that its Board of Directors unanimously had decided to support the continuation of both marketing orders. Accordingly, Sunkist announced its intentions to bloc vote in favor of both marketing orders on behalf of all its member-producers.

The referenda were conducted in June, 1991, in which Sunkist as announced cast its bloc vote in favor of continuing the marketing orders. As a result of Sunkist's large bloc vote, which accounted for 80% of the navel orange votes cast and 85% of the Valencia orange votes cast, both marketing order were continued by a large margin of votes.

## D. Proceedings in the District Court.

On May 7, 1991, after Sunkist had announced its intention to bloc vote, the plaintiffs filed this action in federal district court. In their complaint, plaintiffs sought both a declaration that the bloc-voting provision of the AMAA was unconstitutional as violative of plaintiffs' First and Fifth Amendment rights, and a preliminary and permanent injunction barring the Department of Agriculture from allowing Sunkist to cast a bloc vote. Specifically, plaintiffs alleged the bloc-voting provision (1) violates Harris Farms's Equal Protection and First Amendment rights both by diluting its voting power as an independent producer and by preventing it from effectively lobbying Sunkist's member-producers; (2) violates Kencarol's rights by allowing Sunkist to vote on its behalf even though it had left Sunkist; and (3) violates the First Amendment and Equal Protection rights of John Does One, Two and Three by effectively diluting their votes, cancelling their votes, and allowing Sunkist to vote on their behalf but against their wishes.

In an order dated May 23, 1991, a magistrate judge denied the plaintiffs' request for a preliminary injunction. The magistrate held,

> "Plaintiffs have failed to establish either that there is a possibility of irreparable harm or that the balance of hardships tips sharply in their favor and on that basis alone their application for a preliminary injunction is denied.... Even if Plaintiffs could demonstrate irreparable harm they cannot demonstrate a probability of suc-

**2.** Cecelia Packing Corporation, an independent handler of navel and Valencia oranges for 60

independent producers was originally an appel-

cess on the merits as to any of the issues raised, save one." [3]

After the referenda were conducted in June, Sunkist moved to dismiss the complaint based on the pleadings pursuant to Fed. R.Civ.P. 12(c). By memorandum opinion entered February 5, 1992, the district court granted Sunkist's motion. In a well-reasoned opinion, the district court held (1) the bloc-voting provision does not violate the plaintiffs' First Amendment right to lobby Sunkist growers; (2) the bloc-voting provision does not violate any of the plaintiffs' fundamental rights so as to require the application of strict scrutiny in deciding the Equal Protection challenge; and (3) section 608c(12) is Constitutional under the rational relationship test.

## II

The panel reviews de novo the district court's dismissal of the appellants' claims pursuant to Fed.R.Civ.P. 12(c). *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir.), *cert. denied*, 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 26 (1989). Also, the panel reviews de novo the district court's determinations on questions of law and on mixed questions of law and fact that implicate constitutional rights. *United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1352 (9th Cir.1991). When the district court upholds a restriction on speech, the panel conducts an independent, de novo examination of the facts. *Jacobson v. United States Postal Service*, 993 F.2d 649, 653 (9th Cir. 1993).

## III

The first issue we address is whether appellants have raised a cognizable claim under the First Amendment. They argue that section 608c(12) violates their First Amendment rights in three ways: first, by denying Sunkist producers who disagree with the Sunkist bloc vote a vote in the referenda; second, by forcing Sunkist producers to subsidize and affiliate with the voting stance taken by Sunkist; and third, by "effectively" denying non-Sunkist producers the ability to lobby Sunkist producers to vote against the continuation of the marketing orders. The district court rejected all three arguments, noting that the decision to join Sunkist is left to the individual producer, and that section 608c(12) does not inhibit their ability to vote. The court correctly observed that if the member-producers desired to cast their own ballots, they simply could withdraw from Sunkist. For similar reasons, the court rejected the argument that member-producers were forced into supporting the voting stance taken by Sunkist. Finally, the district court held:

> The bloc-voting provision does not preclude the lobbying of Sunkist growers. Plaintiffs are free to lobby Sunkist growers, Sunkist's board of directors and Sunkist's management. Sunkist corporate bylaws require that all members be growers. The board is entirely comprised of persons elected by grower members. All grower members' voices are heard and their views represented by their elected representatives, the Sunkist Board. The Board appoints Sunkist's officers, who manage the co-op. Plaintiffs can communicate their views to each Sunkist grower member, to each board member, and each officer to persuade adoption of plaintiff's position on issues.

In *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Supreme Court held that a Massachusetts statute which prohibited a corporation from supporting financially certain political causes could not survive Constitutional scrutiny merely because the statute may protect the First Amendment rights of shareholders who disagreed with the corporation's political cause. Allowing the corporation to exercise its political expression, the Court reasoned, would not compel support from the minority shareholders in contravention of

---

lant in this case but moved successfully to withdraw its appeal.

**3.** The magistrate thought the only issue "on which Plaintiffs have demonstrated a probability of success is the USDA's refusal, in spite of Sunkist's willingness, to allow Sunkist growers to 'opt out' of the bloc vote." In denying the preliminary relief, however, the magistrate concluded this and the other arguments should be addressed to Congress.

their constitutional rights. *Id.* at 794–795 & n. 34, 98 S.Ct. at 1425 & n. 34.

In *Bellotti,* the Court distinguished its earlier holding in *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), in which the Court held unconstitutional a requirement that, as a condition of employment, all public school teachers must contribute to a union, even if that union takes political stands with which the teacher disagrees. The distinction between the two cases lends support to the district court's holding in the instant case.

> The critical distinction here is that no shareholder has been "compelled" to contribute anything. Apart from the fact … that compulsion by the State is wholly absent, the shareholder invests in a corporation of his own volition and is free to withdraw his investment at any time and for any reason. A more relevant analogy, therefore, is to the situation where an employee voluntarily joins a union, or an individual voluntarily joins an association, and later finds himself in disagreement with its stance on a political issue.

*Bellotti,* 435 U.S. at 794 n. 34, 98 S.Ct. at 1425 n. 34.

■ The "critical distinction" discussed parenthetically in *Bellotti* is the centerpiece of the instant case. Sunkist producers who disagree with Sunkist's intentions to bloc vote for its members may withdraw voluntarily from Sunkist at any time. Moreover, like shareholders in a corporation, Sunkist producers may act within the cooperative's

governing structure to persuade Sunkist to vote in a particular fashion. *See Bellotti,* 435 U.S. at 794–95, 98 S.Ct. at 1425–26 ("Acting through their power to elect the board of directors or to insist upon protective provisions in the corporation's charter, shareholders normally are presumed competent to protect their own interests.").[4] Under this system, the Secretary's ability to count Sunkist's bloc vote as a vote for all its member-producers does not infringe upon the free speech rights of satisfied producers.

Appellants also argue, however, that the First Amendment issues presented in this case are governed by the principles found in *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). The statute in question in the instant case, however, is much different from the statute challenged in *Meyer,* a Colorado statute which made a felony the act of paying circulators of initiative petitions. In its First Amendment analysis in *Meyer,* the Supreme Court applied "exacting scrutiny" because the statute restricted "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421–22, 108 S.Ct. at 1892. The Court explained:

> The refusal to permit [a party] to pay petition circulators restricts political expression in two ways: First, it limits the number of voices who will convey [a party's] message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that [a party] will garner the

---

**4.** The court in *Bellotti* added to this list of shareholder protections a minority shareholder's "access to the judicial remedy of a derivative suit to challenge corporate disbursements alleged to have been made for improper corporate purposes or merely to further the personal interests of management." *Id.* 435 U.S. at 795, 98 S.Ct. at 1426. As appellants correctly point out, however, the producers' equivalent of this remedy, judicial review of the marketing order itself, has been limited to actions brought by handlers. *See Pescosolido v. Block,* 765 F.2d 827, 831–32 (9th Cir.1985). After the decision in *Pescosolido,* the producers' only protection from an unwanted marketing order is the power to approve or repeal an order. *Id.* at 833.

This fact leads appellants to contend the right to vote individually in an election is their sole remedy to challenge a marketing order and,

therefore, is a fundamental right deserving of heightened scrutiny. We disagree. The act from which the appellants now seek protection is not the Secretary's ability to impose marketing orders, but the cooperative's authorization to cast a bloc vote on behalf of its member-producers. Although a producer's avenue of challenge to the former is limited to the approval and referenda votes, opportunities to challenge the latter include withdrawing from the cooperative, lobbying for support from within the cooperative governing structure, and working to adjust the cooperative's charter to provide further protective provisions. Given that the disgruntled Sunkist producer has several avenues available to him through which his ideas may be expressed, the ability of a cooperative to bloc vote on behalf of all its members does not infringe upon a producer's rights of free speech and free association.

number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id.* at 422–23, 108 S.Ct. at 1892 (footnote omitted).

In contrast to the Colorado statute challenged in *Meyer*, section 608c(12) is not the same kind of restriction on political speech that would require a reviewing court to apply "exacting scrutiny." By requiring the Secretary to count Sunkist's vote in a referendum as the vote of all its producer-members, Congress does not impinge upon "the type of interactive communication concerning political change"; in fact, section 608c(12) does not impinge on communication at all. Unlike the statute in *Meyer*, § 608c(12) does not limit the number of voices that can participate in the debate over the merits of the marketing orders. Sunkist members and non-members alike freely can discuss the upcoming referenda without the threat of criminal sanctions like those imposed by the Colorado statute.

Moreover, section 608c(12) does not limit a producer's ability to make the merits of the marketing orders the focus of statewide or, more appropriately, industry-wide discussion. The regulations notify the producers that a referendum will be conducted at least every six years, giving the producers up to six years to express their views publicly in an attempt to influence their fellow producers' votes. *Meyer*, then, supports neither the appellants' contention that the panel apply a heightened level of scrutiny, nor their claim that section 608c(12) impinges upon a producer's First Amendment rights at all.

■ Likewise, section 608c(12) does not interfere unconstitutionally with the non-member producers' rights to lobby Sunkist growers prior to a referendum. Here, opponents of continuing the marketing orders were notified in 1985 of the referenda on the desirability of the marketing orders to be conducted at least every six years. Alerted by this notice, and armed with an awareness of Sunkist's large bloc of voters, opponents of the marketing orders, both Sunkist members and nonmembers alike, had ample time to voice their positions on the issues and attempt to persuade the members of the Sunkist cooperative to oppose the maintenance of the marketing orders. As the three-judge district court concluded in *Badham v. Eu,* 694 F.Supp. 664, 675 (N.D.Cal.1988), *aff'd,* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989), "The First Amendment guarantees the right to participate in the political process; it does not guarantee political success." Although lobbying the governing body arguably may be more difficult than lobbying individual producers, the right to participate in the referenda process is not impinged upon by § 608c(12).[5]

Thus, we reject appellant's First Amendment claim.

## IV

### A.

Appellants contend that section 608c(12) violates the Fourteenth Amendment's equal protection clause by allowing cooperatives to bloc vote for its entire membership. We disagree.

As a preliminary matter, the Fourteenth Amendment provides that "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. By its express language, "[t]he Fourteenth Amendment applies to actions by a State." *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 542 n. 21, 107 S.Ct. 2971, 2984 n. 21, 97 L.Ed.2d 427 (1987). On its face, then, appellants could not challenge federal legislation on the ground it violates the Fourteenth Amendment. "The Fifth Amendment, however, does apply to the Federal Government and contains an equal protection component." *Id.* "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amend-

---

5. A recent decision in the Ninth Circuit actually will assist interested parties in lobbying producers prior to the next referenda. In *Cal–Almond, Inc. v. United States Dept. of Agric.,* 960 F.2d 105 (9th Cir.1992), the court held the AMAA could "reasonably be interpreted to require public access to the referendum's voter list." *Id.* at 109.

ment." *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976). Accordingly, we apply the law in the Fourteenth Amendment cases under the implicit equal protection clause of the Fifth Amendment.

Generally, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). We apply this deferential standard of review to social and economic legislation, because "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* "The general rule gives way, however, when a statute classifies by race, alienage, or national origin. . . . [T]hese laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *Id.* Strict scrutiny also is applied when the challenged statute "impinge[s] on personal rights protected by the Constitution." *Id.*

█ Appellants contend we should subject section 608c(12) to strict scrutiny because it impinges upon the fundamental right to vote. We disagree. Appellants in this case "proceed[ ] from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." *Burdick v. Takushi*, —— U.S. ——, —— ——, 112 S.Ct. 2059, 2062–63, 119 L.Ed.2d 245 (1992). As the Supreme Court clearly pointed out in *Burdick*, the cases interpreting this area of constitutional law "do not so hold." *Id.* —— U.S. at ——, 112 S.Ct. at 2063.

█ Certainly, the right to vote in certain elections is a fundamental right of all citizens. *Reynolds v. Sims*, 377 U.S. 533, 561–62, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."). Among the types of elections

where the Equal Protection clause requires a one-man, one-vote process are elections of state legislators, *Reynolds*, 377 U.S. 533, 84 S.Ct. 1362 (1964), elections of county officials, *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), and even elections of trustees of a community college district, *Hadley v. Junior College District of Metro. Kansas City, Mo.*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). The underlying connection between these cases is that the officials elected in these elections exercise general governmental power over the entire geographic area served by the elected body. *Ball v. James*, 451 U.S. 355, 362–63, 101 S.Ct. 1811, 1816–17, 68 L.Ed.2d 150 (1981). Limitations on voting in this type of election generally are reviewed under a strict scrutiny standard.[6]

Where the elected officials do not exercise general governmental powers such as administering "such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services," *Id.* at 366, 101 S.Ct. at 1818, limitations on the election are not reviewed under strict scrutiny. *See Ball*, 451 U.S. at 371, 101 S.Ct. at 1821 (upholding as constitutional limits on right to vote in election of water-reclamation district directors); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) (upholding as constitutional limits on voters in water-storage district elections).

Under the foregoing analysis, we conclude that the legislation challenged in this case should be reviewed under the rational relationship test. First, voting in a referendum concerning a marketing order is not "a bedrock of our political system" like voting in an election for national, state or local legislative representatives. *Reynolds*, 377 U.S. at 562, 84 S.Ct. at 1381. The marketing order at issue in the referenda "has relatively limited authority," *Salyer Land Co.*, 410 U.S. at 728, 93 S.Ct. at 1230, and is not "what might be

---

**6.** The Supreme Court recently reviewed a state's restriction on write-in votes in a general election under a lower standard. *See Burdick v. Takushi*, —— U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). There, the Court concluded that even

though voting in such an election is a fundamental right, "the right to vote *in any manner* and the right to associate for political purposes through the ballot are [not] absolute." *Id.* —— U.S. at ——, 112 S.Ct. at 2063.

thought of as 'normal governmental' authority." *Id.* at 729, 93 S.Ct. at 1230.

### B.

■ Under the rational relationship test, we "must determine only whether the statute's classification scheme is rationally related to a legitimate governmental purpose." *Mountain Water Co. v. Montana Dept. of Public Serv. Reg.*, 919 F.2d 593, 597 (9th Cir.1990). When assessing whether the challenged statute rationally furthers a legitimate governmental goal, we "consider the actual basis on which the legislature acted or any hypothetical basis on which it might have acted." *Roley v. Pierce Cty. Fire Protection Dist. No. 4,* 869 F.2d 491, 493 (9th Cir.1989).

Both parts of the rational relationship test are satisfied in this case. First, by allowing the Secretary to count a cooperative's bloc vote as a vote for all member-producers, Congress encourages orange producers to join such cooperatives. These cooperatives, as the Supreme Court has noted, "have a vital interest in the establishment of an efficient marketing system," *United States v. Rock Royal Coop., Inc.,* 307 U.S. 533, 559, 59 S.Ct. 993, 1006, 83 L.Ed. 1446 (1938),[7] and an efficient marketing system, with strong producer participation, was the goal of Congress when it enacted the AMAA and other Depression-era agricultural legislation. *See* II. A.2, *supra.*

Second, the bloc-voting provision furthers the legitimate goal of an efficient marketing system. The Supreme Court has held that the bloc-voting provision is "not an unreasonable provision, as the cooperative is the mar-

keting agency of those for whom it votes." *Id.* Section 608c(12) is but one of the several benefits offered to orange producers if they join together to form producer cooperatives. By allowing the cooperatives to bloc vote, Congress furthers its goal of encouraging producers to form larger economic units, which, in turn, will contribute to more stable and efficient markets.[8]

### V

In summary, we reject appellants' argument that 7 U.S.C. § 608c(12) infringes on the First Amendment rights of either the member-producers or the nonmembers of Sunkist. We reject also appellants' argument that the court must review the appellants' equal protection challenges to section 608c(12) under strict scrutiny. Finally, we conclude that Congress's attempt to empower the individual orange producer and to stabilize the orange market by authorizing the Secretary to count Sunkist's vote in the 1991 referenda as representing the votes of all Sunkist's member-producers survives Constitutional scrutiny under the rational relationship test.

**AFFIRMED.**

---

**7.** The Ninth Circuit previously explained that in *Rock Royal,* "due process rights [were] found not to be implicated under the marketing order system; [there] the Supreme Court ... upheld the constitutionality of the system despite the fact that it may produce results with which some growers or handlers will disagree." *Saulsbury Orchards and Almond Processing, Inc.,* 917 F.2d 1190, 1197 (9th Cir.1990) (citing *Rock Royal*). In the *Rock Royal* decision, the Supreme Court specifically approved the bloc-voting provision as a legitimate extension of Congressional legislative authority: "[I]nsomuch as Congress could place the [marketing order] in effect without any vote, it is permissible for it to provide for approval or disapproval in such way or manner as it

chooses." *Rock Royal,* 307 U.S. at 578, 59 S.Ct. at 1015.

**8.** The magistrate judge may have summed up this analysis best:

"[I]t appears that bloc voting is rationally related to the Congressional purpose of providing an economic advantage to growers who choose to join together in a co-op in order to increase their collective economic strength and advantage in the market. Because these producers voluntarily join the cooperative and may voluntarily leave it and because the very purpose in joining together is to provide consistent management and marketing there is a rational basis which supports bloc voting."